Nos. 10-0712-cv, 10-0898-cv, 10-1288-cv
In re Lehman Bros. Mortg.-Backed Sec. Litig, et. al.,
Wyo. State Treasurer v. Moody's Investors Serv., Inc.
Vaszurele Ltd. v. Moody's Investors Serv., Inc.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————

August Term, 2010

(Argued: January 11, 2011      Decided: May 11, 2011)

Docket Nos. 10-0712-cv; 10-0898-cv; 10-1288-cv

———————————

IN RE LEHMAN BROTHERS MORTGAGE-BACKED SECURITIES LITIGATION
———————————

WYOMING STATE TREASURER, WYOMING RETIREMENT SYSTEM,

*Plaintiffs-Appellants*,

POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, INDIVIDUALLY, POLICE AND FIRE RETIREMENT SYSTEM OF THE CITY OF DETROIT, ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiffs*,

—v.—

MOODY'S INVESTORS SERVICE, INC., THE MCGRAW-HILL COMPANIES, INC., FITCH INC.,

*Defendants-Appellees*,

INDYMAC MBS, INCORPORATED, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A5CB, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR9, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR11, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR6, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A6, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A7CB, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR13, INDYMAC INDX MORTGAGE LOAN TRUST 2006-1, INDYMAC HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST, SERIES 2006-H2, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR21, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A8, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR19, INDYMAC INDZ MORTGAGE

LOAN TRUST 2006-AR1, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR23, RESIDENTIAL ASSET SECURITIZATION TRUST, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR12, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR25, INDYMAC INDX MORTGAGE LOAN TRUST 2006-R1, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A11, INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR2, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR27, INDYMAC HOME EQUITY MORTGAGE LOAN ASSET-BACKED TRUST, SERIES 2006-H3, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A12, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR29, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR31, INDYMAC INDX MORTGAGE LOAN TRUST 2006-FLX1, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A13, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A13, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-R2, INDYMAC INDA MORTGAGE LOAN TRUST 2006-AR3, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR14 (AND 5 ADDITIONAL GRANTOR TRUSTS FOR THE CLASS 1-A1A, CLASS 1-A2A, CLASS 1-A3A, CLASS 1-A3B AND CLASS 1A4A CERTIFICATES, TO BE ESTABLISHED BY THE DEPOSITOR), RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A14CB, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR33, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A15, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR35, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR37, RESIDENTIAL ASSET SECURITIZATION TRUST 2006-A16, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR41, INDYMAC INDX MORTGAGE LOAN TRUST 2006-AR39, RESIDENTIAL ASSET SECURITIZATION TRUST, INDYMAC INDX MORTGAGE LOAN TRUST, INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR1, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A1, INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX1, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A2, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR1, INDYMAC INDX MORTGAGE LOAN TRUST 207-FLX2, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A3, INDYMAC INDA MORTGAGE LOAN TRUST, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR5, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A5, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR7, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR9, INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR2, INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX3, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR11, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A6, INDYMAC IMSC MORTGAGE LOAN TRUST 2007-F1, RESIDENTIAL ASSET SECURITIZATION TRUST 2007-A7, INDYMAC INDX MORTGAGE LOAN TRUST 2007-AR13, INDYMAC INDA MORTGAGE LOAN TRUST 2007-AR3, INDYMAC INDX MORTGAGE LOAN TRUST 2007-FLX4, INDYMAC IMJA MORTGAGE LOAN TRUST 2007-A1, INDYMAC IMJA MORTGAGE LOAN TRUST, JOHN OLINSKI, BLAIR S. ABERNATHY, RAPHAEL BOSTIC, SAMIR GROVER, SIMON HEYRICK, VICTOR H. WOODWORTH, BANC OF AMERICA SECURITIES LLC, J.P. MORGAN SECURITIES INC., AS SUCCESSOR-IN-INTEREST TO BEAR, STEARNS COMPANY, INC., CITIGROUP GLOBAL MARKETS INC., COUNTRY WIDE SECURITIES CORPORATION, CREDIT SUISSE SECURITIES (USA) LLC, DEUTSCHE BANK SECURITIES INC., DEUTSCHE BANK NATIONAL TRUST COMPANY, GOLDMAN, SACHS &

2

COMPANY, GREENWICH CAPITAL MARKETS, INCORPORATED, HSBC SECURITIES (USA) INC., INDYMAC SECURITIES CORPORATION, J.P. MORGAN SECURITIES, INC., LEHMAN BROTHERS INC., BANK OF AMERICA CORPORATION, AS SUCCESSOR-IN-INTEREST TO MERRILL LYNCH, PIERCE, FENNER & SMITH, INC., MORGAN STANLEY & COMPANY, INCORPORATED, UBS SECURITIES LLC, FITCH RATINGS, JPMORGAN CHASE & CO., RBS SECURITIES, INC., UBS SECURITIES LLC, MICHAEL PERRY,

*Defendants*,

LYNETTE ANTOSH, INDYMAC INDX MORTGAGE LOAN TRUST SERIES 2006-AR14, INDYMAC INDX MORTGAGE LOAN TRUST SERIES 2006-AR2, INDYMAC INDX MORTGAGE LOAN TRUST SERIES 2006-AR15, INDYMAC INDX MORTGAGE LOAN TRUST SERIES 2006-AR4, INDYMAC INDX MORTGAGE LOAN TRUST SERIES 2006-AR7, INDYMAC RESIDENTIAL MORTGAGE BACKED TRUST SERIES 2006-L2, INDYMAC RESIDENTIAL ASSET BACKED TRUST SERIES 2006-D, BANK OF AMERICA CORPORATION, SUCCESSOR-IN-INTEREST TO COUNTRYWIDE SECURITIES CORPORATION, FITCH RATING LIMITED,

*Consolidated-Defendants*.

—————————————

VASZURELE LIMITED,

*Lead Plaintiff-Appellant*,

VASILI TSERETELI, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,

*Plaintiff*,

—v.—

MOODY'S INVESTORS SERVICE, INC., THE MCGRAW HILL COMPANIES, INC.,

*Defendants-Appellees*,

Residential Asset Securitization Trust 2006-A8, Credit Suisse Securities (USA) LLC,

*Defendants*.[*]

—————————————

---

[*] The Clerk of the Court is directed to amend the captions to read as shown above.

Before:

FEINBERG, CABRANES, and RAGGI, *Circuit Judges.*

_____

Appeals from three judgments of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*) dismissing plaintiffs' complaints seeking to hold the rating agency defendants liable as underwriters or control persons for misstatements or omissions in securities offering documents in violation of §§ 11 and 15 of the Securities Act of 1933. See 15 U.S.C. §§ 77k(a)(5), 77o(a).

AFFIRMED.

_____

JOEL P. LAITMAN, Cohen Milstein Sellers & Toll PLLC, New York, New York (Michael B. Eisenkraft, Daniel B. Rehns, Kenneth M. Rehns, Cohen Milstein Sellers & Toll PLLC, New York, New York; Steven J. Toll, Joshua S. Devore, Matthew B. Kaplan, S. Douglas Bunch, Cohen Milstein Sellers & Toll PLLC, Washington, D.C., *on the brief*), *for Lead Plaintiff-Appellant Locals 302 & 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust* and *Plaintiffs-Appellants New Jersey Carpenters Health Fund* and *Boilermakers-Blacksmith National Pension Trust.*

JOSEPH J. TABACCO, JR., Berman DeValerio, San Francisco, California (Patrick T. Egan, Berman DeValerio, Boston, Massachusetts, *on the brief*), *for Plaintiffs-Appellants Wyoming State Treasurer* and *Wyoming Retirement System.*

LESTER L. LEVY, Wolf Popper LLP, New York, New York, *for Lead Plaintiff-Appellant Vaszurele Limited.*

FLOYD ABRAMS (S. Penny Windle (admission pending), Adam Zurofsky, Tammy L. Roy, *on the brief*), Cahill Gordon & Reindel LLP, New York, New York, *for Defendant-Appellee The McGraw Hill Companies, Inc.*

JAMES J. COSTER (Joshua M. Rubins, Glenn C. Edwards, *on the brief*), Satterlee Stephens Burke & Burke LLP, New York, New York, *for Defendant-Appellee Moody's Investors Service, Inc*.

ANDREW J. EHRLICH (Martin Flumenbaum, *on the brief*), Paul, Weiss, Rifkind, Wharton & Garrison LLP, New York, New York, *for Defendant-Appellee Fitch, Inc*.

REENA RAGGI, *Circuit Judge*:

Because these three appeals raise common questions of law, we dispose of them in a single opinion. Plaintiffs, Locals 302 & 612 of the International Union of Operating Engineers – Employers Construction Industry Retirement Trust ("Operating Engineers"), New Jersey Carpenters Health Fund, and Boilermakers-Blacksmith National Pension Trust (collectively, "Union Plaintiffs"); Wyoming State Treasurer and Wyoming Retirement System (collectively, "Wyoming"); and Vaszurele Limited ("Vaszurele"), appeal from judgments of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge*) entered on February 5, 2010, and February 17, 2010, dismissing their class-action complaints seeking to hold defendants, The McGraw Hill Companies, Inc. ("McGraw Hill"), through its subsidiary Standard & Poor's ("S&P"), Moody's Investors Service, Inc. ("Moody's"), and/or Fitch, Inc. ("Fitch") (collectively, "Rating Agencies"), liable as underwriters or control persons for misstatements or omissions in securities offering documents in violation of §§ 11 and 15 of the Securities Act of 1933 ("1933 Act"). See 15 U.S.C. §§ 77k(a)(5), 77o(a). Plaintiffs submit that the Rating Agencies are "underwriters"

5

as defined by 15 U.S.C. § 77b(a)(11) because they helped structure securities transactions to achieve desired ratings. The Union Plaintiffs and Wyoming also submit that the Rating Agencies' alleged provision of advice and direction to primary violators regarding transaction structures makes the agencies liable as "control persons." Id. § 77o(a). Finally, plaintiffs charge the district court with abuse of discretion in implicitly denying their requests to amend.

We reject these arguments as without merit.

## I.    **Background**

On appeal, we assume the truth of the facts alleged in plaintiffs' complaints. See, e.g., In re NYSE Specialists Sec. Litig., 503 F.3d 89, 91 (2d Cir. 2007).

### A.    The Securities Offerings

#### 1.    Mortgage Pass-Through Certificates

In the period from 2005 to 2007, plaintiffs and similarly situated persons purchased approximately $155 billion worth of mortgage pass-through certificates registered with the Securities and Exchange Commission ("SEC") entitling them to distributions from underlying pools of mortgages. To create such certificates, a "sponsor" originates or acquires mortgages. Next, the loans are sold to a "depositor" that securitizes the loans — meaning, in effect, that the depositor secures the rights to cash flows from the loans so that those rights can be sold to investors. The loans are then placed in issuing trusts, which collect the principal and interest payments made by the individual mortgage borrowers and, in turn, pay out distributions to the purchasers of the mortgage pass-through certificates. Finally,

6

different risk levels, or "tranches" of risk, are created by using various types of credit enhancement, such as subordinating lower tranches to absorb losses first, overcollateralizing the loan pools in excess of the bond amount, or creating an excess spread fund to cover the difference between the interest collected from borrowers and amounts owed to investors.[1] Each tranche is denominated by a credit rating — in these cases issued by one or more Rating Agencies — determined by the seniority level and the expected loss of the loan pool. Finally, the depositor sells the certificates to underwriters, who then offer them to investors.

Many of the certificates here at issue received AAA ratings, the "safest" tranche supposedly least likely to default. Investment-grade ratings were crucial to the certificates' sale because many institutional investors must purchase investment-grade securities. Moreover, some senior certificates' sales were conditioned on the receipt of AAA ratings.

2.      Union Plaintiffs' Purchase of Certificates

The Union Plaintiffs and other similarly situated persons bought certificates in ninety-four offerings between September 29, 2005, and July 28, 2007, that were sponsored by Lehman Brothers Holdings, Inc. ("LBHI") and underwritten by Lehman Brothers, Inc., with Structured Asset Securities Corporation ("SASCo"), a wholly-owned LBHI entity, acting as depositor (collectively, "Lehman"). The certificates were issued pursuant to one of two

_____

[1] Subordinating the bonds creates a tiered structure known as a "waterfall." Losses from mortgage defaults, delinquencies, or other factors are allocated in reverse seniority, with junior tranches incurring losses first until their interests are reduced to zero.

registration statements, initially filed with the SEC on September 16, 2005, and August 8, 2006, respectively. S&P and Moody's rated the securities.

### 3. Wyoming's Purchase of Certificates

Wyoming and similarly situated persons purchased certificates sponsored by IndyMac Bank, with IndyMac MBS, Inc. acting as depositor. Many large investment banks underwrote the offerings, which were issued pursuant to three registration statements first filed on August 15, 2005, February 24, 2006, and February 14, 2007, respectively. S&P, Moody's, and Fitch rated Wyoming's certificates.

### 4. Vaszurele's Purchase of Certificates

Vaszurele and similarly situated plaintiffs acquired senior mortgage pass-through certificates, issued on June 28, 2006, by the Residential Asset Securitization Trust 2006-A8 ("RAST"). IndyMac Bank sponsored Vaszurele's certificates, with IndyMac MBS, Inc. acting as depositor and Credit Suisse Securities (USA) Inc. as lead underwriter. S&P and Moody's rated the certificates acquired by Vaszurele, which are traceable to a registration statement initially filed on February 24, 2006.

### B. Rating Agencies' Alleged Role in the Offerings

In the transactions described above, plaintiffs allege that the Rating Agencies, which ordinarily serve as passive evaluators of credit risk, exceeded their traditional roles by actively aiding in the structuring and securitization process. Specifically, plaintiffs allege that issuing banks engaged particular Rating Agencies through a "ratings shopping" process,

8

whereby the Rating Agencies reviewed loan-level data for a mortgage pool and provided preliminary ratings. Union Compl. ¶ 66; Wyoming Compl. ¶ 200. The banks then negotiated with the Rating Agencies regarding the amount of credit enhancements and percentage of AAA certificates for each mortgage pool. By thus "play[ing] the agencies off one another" and choosing the agency offering the highest percentage of AAA certificates with the least amount of credit enhancements, the banks purportedly "engender[ed] a race to the bottom in terms of rating quality." Union Compl. ¶ 170.

During and after this negotiation, the Rating Agencies engaged in an "iterative process" with the banks, providing "feedback" on which combinations of loans and credit enhancements would generate particular ratings. Id. ¶ 177 (internal quotation marks and emphasis omitted); Wyoming Compl. ¶ 91 (internal quotation marks and emphasis omitted); Vaszurele Compl. ¶ 38 (internal quotation marks and emphasis omitted). In the course of this dialogue, issuers adjusted the certificates' structures until they achieved desired ratings. As one Moody's officer described the process: "You start with a rating and build a deal around a rating." Union Compl. ¶ 176 (internal quotation marks and emphasis omitted); Wyoming Compl. ¶ 90 (internal quotation marks omitted); Vaszurele Compl. ¶ 38 (internal quotation marks and emphasis omitted). Plaintiffs submit that the Rating Agencies thus helped determine the composition of loan pools, the certificates' structures, and the amount and kinds of credit enhancement for particular tranches.

9

Toward this end, the Rating Agencies allegedly provided their modeling tools to the banks' traders to help them pre-determine the combinations of credit enhancements and loans needed to achieve specific ratings. S&P's LEVELS or SPIRES models, and Moody's M-3 model, analyzed fifty to eighty different loan characteristics in estimating the number and extent of likely loan defaults. Based on these factors, the models calculated the amount of credit enhancement required for a specific pool of loans to receive a AAA rating. According to the Union Plaintiffs, LBHI used the modeling data in determining bidding prices for loans. Moody's and S&P also received loan-level files and advised Lehman on appropriate loan prices. The Rating Agencies, however, had purportedly failed to update their models to reflect accurately the higher risks of certain underlying loans, such as subprime, interest-only, and negative amortization mortgages.[2] The models also failed to account for deteriorating loan origination standards. As a result, plaintiffs complain that the certificates' AAA or investment-grade ratings did not accurately represent their risk.

---

[2] Subprime mortgages are loans made to borrowers with poor credit histories, "creating a high risk of default." Black's Law Dictionary 1021 (9th ed. 2009); see also Till v. SCS Credit Corp., 541 U.S. 465, 471 (2004) (describing subprime loans as "loans to borrowers with poor credit ratings"). An interest-only loan allows borrowers to pay only the interest for a stated period "in return for significantly larger payments later." Black's Law Dictionary at 1020. A negative amortization loan involves increases in the principal balance when monthly payments are insufficient to pay accruing interest. Id. at 99. Plaintiffs allege that S&P developed an updated ratings model in 2004 that covered these new mortgage products, but it was never implemented.

C.    District Court Proceedings

During the 2008 mortgage crisis, the Rating Agencies downgraded plaintiffs' AAA or investment-grade certificates, causing their values to decline. Plaintiffs proceeded to sue various entities involved in their offerings.

The Union Plaintiffs' suit originated as two complaints filed in the Supreme Court of New York against various Lehman entities, the issuing trusts, and individual Lehman executives. Neither complaint named the Rating Agencies as defendants. After the cases were removed to the Southern and Eastern Districts of New York, respectively, the Lehman entities filed for bankruptcy. The Southern District court consolidated the cases and appointed the Operating Engineers as lead plaintiff. The Union Plaintiffs then filed the Consolidated Securities Class Action Complaint at issue here, naming, for the first time, McGraw Hill and Moody's as defendants.

Wyoming's suit similarly began as two complaints filed in the Southern District of New York. In a July 29, 2009 order, the district court consolidated the cases and named Wyoming lead plaintiff. Wyoming then filed the Consolidated Class Action Complaint at issue on appeal against, inter alia, IndyMac MBS, individual defendants, several underwriter entities, and all three Rating Agencies.

Vasili Tsereteli, the sole shareholder of Vaszurele, initially filed a complaint in the Supreme Court of New York, which was removed to the Southern District of New York. The district court substituted Vaszurele as lead plaintiff because Tsereteli did not himself

11

purchase certificates. The Amended Class Action Complaint at issue here brings claims against RAST, Credit Suisse Securities (USA) LLC, McGraw Hill, and Moody's.

All plaintiffs allege that the Rating Agencies that rated their certificates are "underwriters" as defined in 15 U.S.C. § 77b(a)(11) and, therefore, are strictly liable pursuant to § 11(a)(5) for misstatements and omissions in the certificates' offering documents. See 15 U.S.C. § 77k(a)(5).[3] The Union Plaintiffs and Wyoming further allege that the Rating Agencies are liable under § 15 as control persons of the depositors or issuers. See id. § 77o(a). Vaszurele did not assert a control person claim.[4]

The Rating Agencies moved to dismiss all claims against them, which motions the district court granted. In an opinion filed in the Union Plaintiffs' case, the district court ruled that the Rating Agencies could not be liable under § 11 because they did not fall within the statutory definition of "underwriter" when they participated in creating the securities but not

---

[3] Plaintiffs complain that the registration statements contained misrepresentations or omissions regarding, inter alia, the underlying loans, the banks' underwriting and appraisal practices, the banks' ratings-shopping practices, and the Rating Agencies' non-independent role in structuring securities and their failure to update their rating models. We need not address the legal implications of these alleged misstatements and omissions because the district court dismissed the claims against the Rating Agencies for failure to plead sufficiently underwriter or control person status, regardless of the offering documents' content.

[4] In the district court, the Union Plaintiffs and Vaszurele also sought rescission pursuant to § 12 from the Rating Agencies as "sellers." See 15 U.S.C. § 77l(a)(2). Vaszurele further alleged that the Rating Agencies were liable as experts pursuant to § 11(a)(4). See id. § 77k(a)(4). Because neither plaintiff appeals the district court's dismissal of these claims, we do not consider them. See Nationwide Mut. Ins. Co. v. Mortensen, 606 F.3d 22, 28-29 (2d Cir. 2010).

in purchasing them for resale. See In re Lehman Bros. Sec. & ERISA Litig., 681 F. Supp. 2d 495, 498-99 (S.D.N.Y. 2010). The district court also dismissed the control person claim because the Rating Agencies' power to influence or persuade the primary violators did not constitute the requisite "practical ability to direct the actions of people who issue or sell securities." Id. at 500-01 (emphasis in original; internal quotation marks omitted). The district court relied on these reasons in ordering dismissal of the Wyoming and Vaszurele complaints. See Order, In re Indymac Mortg.-Backed Sec. Litig., No. 09 Civ 4583 (S.D.N.Y. Feb. 5, 2010); Order, Tsereteli v. Residential Asset Securitization Trust 2006-A8, No. 08 Civ 10637 (S.D.N.Y. Feb. 5, 2010). The district court did not address plaintiffs' requests for leave to amend made in their briefs opposing the motions to dismiss.

These timely appeals followed.

## II. Discussion

### A. Standard of Review

We review de novo the district court's dismissal of plaintiffs' complaints pursuant to Fed. R. Civ. P. 12(b)(6), accepting as true all facts alleged in the complaints and "drawing all reasonable inferences" in plaintiffs' favor. In re NYSE Specialists Sec. Litig., 503 F.3d at 91, 95. Where, as here, dismissed claims arise under § 11, we conduct a "preliminary inquiry" into whether plaintiffs' allegations are premised on fraud so as to require satisfaction of the heightened pleading standards of Fed. R. Civ. P. 9(b). In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358 (2d Cir. 2010). We conclude that Rule 9(b) does not

13

apply to this case because Wyoming expressly disclaims any allegation of fraud, <u>see</u> Wyoming Compl. ¶ 218, the Union Plaintiffs and Vaszurele effectively do so by invoking the notice-pleading standard, <u>see</u> Union Pls. Br. at 15-16; Vaszurele Br. at 15-16, and defendants do not contend otherwise. Accordingly, we review the complaints' sufficiency under the notice-pleading standard, which requires plaintiffs to assert "enough facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007); <u>see also</u> Fed. R. Civ. P. 8(a)(2) (providing that pleading must contain "short and plain statement" of claim showing pleader's entitlement to relief); <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009); <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>, 592 F.3d at 358.

### B. Section 11(a)(5) Underwriter Claims

Section 11 provides the purchasers of registered securities with strict liability protection for material misstatements or omissions in registration statements filed with the SEC. The imposition of strict liability is limited, however, to statutorily enumerated parties: (1) signatories of the registration statement; (2) directors or partners of the issuer at the time of filing; (3) persons consenting to be named as about to become a director or partner; (4) accountants or other experts consenting to be named as preparing or certifying part of the registration statement; and (5) underwriters of the security at issue. <u>See</u> 15 U.S.C. § 77k(a); <u>Herman & MacLean v. Huddleston</u>, 459 U.S. 375, 381-82 (1983) (noting "limited" scope of § 11 as evidenced by fact that only "certain enumerated parties in a registered offering" may be sued for "false or misleading information"); <u>In re Morgan Stanley Info. Fund Sec. Litig.</u>,

592 F.3d at 358-59.[5] Plaintiffs assert that the Rating Agencies are strictly liable under § 11 as "underwriters" and that the district court erred in construing that term as limited to persons involved in the distribution of securities.

The term "underwriter" is defined in the 1933 Act as:

[5] Section 11 states as follows:

(a) In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction, sue--

(1) every person who signed the registration statement;

(2) every person who was a director of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted;

(3) every person who, with his consent, is named in the registration statement as being or about to become a director, person performing similar functions, or partner;

(4) every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him;

(5) every underwriter with respect to such security.

15 U.S.C. § 77k(a).

15

> any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security, or participates or has a direct or indirect participation in any such undertaking, or participates or has a participation in the direct or indirect underwriting of any such undertaking.

15 U.S.C. § 77b(a)(11). Plaintiffs submit that the Rating Agencies qualify as underwriters because they structured the certificates here at issue to achieve desired ratings, which was a necessary predicate to the securities' distribution in the market. We are not persuaded. The plain language of the statute limits liability to persons who participate in the purchase, offer, or sale of securities for distribution. While such participation may be indirect as well as direct, the statute does not reach further to identify as underwriters persons who provide services that facilitate a securities offering, but who do not themselves participate in the statutorily specified distribution-related activities.

### 1. Underwriter Liability Requires Participation in Activities Involving the Distribution of Securities to the Public

#### a. The Statute's Plain Language

To interpret the statutory definition of "underwriter," we begin, as we must, with the statute's text, considering the ordinary meaning of Congress's chosen language as informed by its punctuation. See BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004); Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) ("Statutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." (internal quotation marks and brackets omitted)); see also United States Nat'l Bank of Or.

16

v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 454 (1993) (observing that plain meaning of statutory text "will typically heed the commands of its punctuation").

Applying these principles here, we conclude that common to all categories of persons identified as "underwriters" by the plain language of § 77b(a)(11) is activity related to the actual distribution of securities. With respect to the first two categories of persons qualifying as "underwriters" — those who (1) purchase from an issuer or (2) offer or sell for an issuer — this is evidenced by the fact that the distribution requirement is set off from the two antecedent activities by a comma. See 15 U.S.C. § 77b(a)(11) (defining "underwriter" as "any person who has purchased from an issuer with a view to, or offers or sells for an issuer in connection with, the distribution of any security" (emphasis added)); Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd., 186 F.3d 210, 215 (2d Cir. 1999) ("When a modifier is set off from a series of antecedents by a comma, the modifier should be read to apply to each of those antecedents."), abrogated on other grounds by Sarhank Grp. v. Oracle Corp., 404 F.3d 657 (2d Cir. 2005); accord Stepnowski v. Comm'r of Internal Revenue, 456 F.3d 320, 324 (3d Cir. 2006); cf. Allard K. Lowenstein Int'l Human Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010) (noting corollary rule regarding last antecedents dictating that "qualifying phrase" not separated from prior items by comma usually refers only to immediately antecedent item). Indeed, this interpretation is especially warranted here because the first category, persons "purchasing from an issuer with a view to," is incomplete unless read in conjunction with "the distribution of any security."

17

With respect to the last two categories of persons qualifying as "underwriters," their connection to the activity of distribution is evidenced by use of the phrase "such undertaking," which plainly references the aforesaid purchases, offers, or sales relating to the distribution of securities. 15 U.S.C. § 77b(a)(11) (defining underwriter as "any person who . . . participates or has a direct or indirect participation in any <u>such undertaking</u>, or participates or has a participation in the direct or indirect underwriting of any <u>such undertaking</u>" (emphasis added)); <u>see</u> 17 <u>Oxford English Dictionary</u> 101 (2d ed. 1989) (defining "such" as "[o]f the character, degree or extent described . . . in what has been said"); <u>Webster's Third New International Dictionary</u> 2283 (1961) (defining "such" as something "previously characterized or specified"); <u>Black's Law Dictionary</u> 1570 (9th ed. 2009) (defining "such" as "[t]hat or those; having just been mentioned"); <u>see also</u> <u>In re Refco, Inc. Sec. Litig.</u>, No. 05 Civ 8626, 2008 WL 3843343, at *4 (S.D.N.Y. Aug. 14, 2008) (concluding that "'participation' in question" in § 77b(a)(11) "is participation in the 'undertaking' referred to immediately before").

Thus, to qualify as an underwriter under the participation prongs of the statutory definition, a person must participate, directly or indirectly, in purchasing securities from an issuer with a view to distribution, in offering or selling securities for an issuer in connection with a distribution, or in the underwriting of such an offering. <u>See generally</u> <u>Alameda Cnty. Emps.' Ret. Ass'n v. Ebbers (In re WorldCom Sec. Litig.)</u>, 308 F. Supp. 2d 338, 344 (S.D.N.Y. 2004) (Cote, J.) ("According to the statutory definition of an underwriter . . .

18

liability under Section 11 extends to any person who has purchased securities from an issuer for distribution, or who offers or sells securities for an issuer for that purpose, or who participates directly or indirectly in those tasks."). Nothing in the statute's text supports expanding the definition of underwriter to reach persons not themselves participating in such purchases, offers, or sales, but whose actions may facilitate the participation of others in such undertakings.[6]

> b.  Relevant Precedent

Plaintiffs acknowledge that § 77b(a)(11) references activities relating to the distribution of securities. Nevertheless, they submit that our precedent has construed the term "underwriter" broadly to "include any person who is 'engaged in steps necessary to the distribution of security issues.'" SEC v. Kern, 425 F.3d 143, 152 (2d Cir. 2005) (quoting SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d 738, 741 (2d Cir. 1941)). Relying on this language, plaintiffs submit that any persons playing an essential role in a public offering — including the Rating Agency defendants — may be liable as underwriters. We disagree.

---

[6] Contrary to the Union Plaintiffs' contention, 17 C.F.R. § 230.137 (providing that certain publications by brokers or dealers do not constitute offering securities or participating in underwriting if the publisher is not participating in the distribution of securities) does not support a more expansive interpretation of 15 U.S.C. § 77b(a)(11). The SEC created this safe harbor to protect brokers or dealers from underwriter liability when they publish research regarding offerings in which they did not participate because these entities often sell or offer securities for an issuer. See SEC Release No. 33-5101, 35 Fed. Reg. 18456, 18456 (Dec. 4, 1970). Because this rule does not relate to any entities other than brokers and dealers, it is not relevant to this case.

19

Contrary to plaintiffs' contention, our prior cases do not hold that anyone taking steps that facilitate the eventual sale of a registered security fits the statutory definition of underwriter. Rather, in SEC v. Kern, we stated that "underwriter" references those who take "steps necessary to the distribution" of securities. Id. at 152. While we explained that distribution encompasses "the entire process by which in the course of a public offering the block of securities is dispersed and ultimately comes to rest in the hands of the investing public," id. at 152 (internal quotation marks omitted), this precedent cannot be read to expand the definition of underwriter to those who participate only in non-distributional activities that may facilitate securities' offering by others.[7] Rather, Kern is fairly construed to instruct that

---

[7] In reaching this conclusion, we note that the "steps necessary to the distribution" language relied on by plaintiffs was originally employed by this court to explain a registration exemption, not the underwriter definition. In SEC v. Chinese Consolidated Benevolent Association, Inc., we concluded that a corporation soliciting buyers for unregistered Chinese government bonds was a statutory underwriter because it sold securities for an issuer despite not acting at the issuer's behest. 120 F.2d at 739-41. As an underwriter, the corporation did not qualify for § 4(1)'s registration exemption for "'[t]ransactions by any person other than an issuer, underwriter, or dealer.'" Id. at 740-41 (quoting 15 U.S.C. § 77d(1)). We alternatively concluded that the corporation was ineligible for the § 4(1) registration exemption, even if it was not itself an underwriter, because it participated in a transaction involving an issuer. Id. at 741. In this context, we stated that "[i]t," meaning the exemption, "does not . . . protect those who are engaged in steps necessary to the distribution of" securities because it is limited to transactions between individual investors. Id.; see SEC v. Van Horn, 371 F.2d 181, 188 (7th Cir. 1966) (noting that Chinese Consolidated referred to registration exemption in using "steps necessary" language); SEC v. Culpepper, 270 F.2d 241, 247 (2d Cir. 1959) (noting that Chinese Consolidated held exemption applicable to "transactions between individual investors," not "distributions by issuers or acts of other individuals who engage in steps necessary to such distributions"); see also SEC v. Holschuh, 694 F.2d 130, 137-38 (7th Cir. 1982) (concluding that registration exemption does not apply to "distributions by issuers or acts of others who engage in steps necessary to such distributions").

SEC v. Kern subsequently quoted Chinese Consolidated's "steps necessary" language

---

20

persons playing roles essential in the actual distribution of securities qualify as underwriters. See SEC v. Kern, 425 F.3d at 152; United States v. Abrams, 357 F.2d 539, 547 (2d Cir. 1966) ("The [1933 Act] . . . defines an underwriter as one who takes from an issuer with a view toward distribution." (emphasis added)); see also SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1086 (9th Cir. 2010) (defining "underwriter" as "[a]ny intermediary between the issuer and the investor that is an essential cog in the distribution process" (internal quotation marks omitted)); In re Refco, Inc. Sec. Litig., 2008 WL 3843343, at *4 ("[T]he breadth of the definition of 'underwriter' is intended to sweep up all – but only – those who play a role in the distribution of the securities."). Indeed, the cases cited by plaintiffs all involved defendants who themselves participated in distributing securities. See, e.g., SEC v. Kern, 425 F.3d at 152 (defendants "acquired securities from affiliates with a view to distribution"); SEC v. N. Am. Research & Dev. Corp., 424 F.2d at 72 (defendant "participate[d] in a distribution" by acquiring and selling shares); SEC v. Culpepper, 270 F.2d 241, 247 (2d Cir. 1959) (defendant publicly resold shares he received as repayment); SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d at 740-41 (defendant "solicited" orders, "obtained [] cash from" purchasers, and "forwarded" bonds); Special Situations Fund v. Cocchiola, No. 02-3099, 2007 WL 2261557, at *6-8 (D.N.J. Aug. 3, 2007) (identifying

_____

to help define "underwriter" in a case involving the same registration exemption. See 425 F.3d at 152. This statement was arguably dictum because the transaction in that case unquestionably "involved underwriters," rendering § 4(1) inapplicable. Id. at 152-53. In any event, we need not here question Kern's interpretation of the underwriter definition because it is consistent with our own. We simply note that the case's context further undermines plaintiffs' argument on appeal.

fact issue regarding underwriter status when documents named defendants as underwriters

and stated that they had purchased shares and received underwriting fee).[8]

In urging otherwise, plaintiffs also rely on Harden v. Raffensperger, Hughes & Co.,

65 F.3d 1392 (7th Cir. 1995), wherein the Seventh Circuit held a qualified independent

underwriter ("QIU") subject to § 11 underwriter liability because it was "necessary to the

distribution." Id. at 1400-01 (internal quotation marks omitted). That conclusion, however,

is not as broad as plaintiffs urge because the court in Harden made clear that its inquiry was

limited to the statutorily enumerated activities, i.e., whether defendant had participated in

"purchas[ing] . . . notes with a view to distribution," or offering or selling notes "in

connection with their distribution." Id. at 1400. Moreover, Harden is easily distinguished

from the instant cases. There, the Seventh Circuit emphasized the appropriateness of

---

[8] Many of plaintiffs' cases are, in fact, of questionable relevance because they involved SEC enforcement actions against defendants for selling unregistered securities in violation of § 5 rather than § 11 liability for misstatements or omissions in registration statements. See, e.g., SEC v. Kern, 425 F.3d at 147-48; SEC v. N. Am. Research & Dev. Corp., 424 F.2d at 70-72, 80-82; SEC v. Culpepper, 270 F.2d at 245-48; SEC v. Chinese Consol. Benevolent Ass'n, Inc., 120 F.2d at 739-41. "[I]n the context of an enforcement action," courts have held "any person who is a 'necessary participant' or a 'substantial factor' in" a sale of unregistered securities liable pursuant to § 5. 1 Thomas Lee Hazen, Law of Securities Regulation § 2.2[1][A] (6th ed. 2011); see SEC v. Holschuh, 694 F.2d at 137-38 (noting "doctrine of participant liability" in § 5 actions and concluding defendants were "necessary participant[s]" or a "substantial factor" in sale by forming entities (internal quotation marks omitted)). Although the underwriter definition includes participants in the listed distributional activities, it is not clear that the broad "substantial factor" test should be imported wholesale into § 11. In any event, because we conclude that plaintiffs failed to allege that the Rating Agencies played a substantial role in purchasing securities for resale, or offering or selling securities for an issuer, plaintiffs' § 11 claims would fail even under a substantial factor test.

imposing § 11 liability on a QIU who voluntarily and explicitly assumed the liabilities of an underwriter because, in accordance with NASD rules, the issuer could not use a non-independent affiliate as its underwriter without a QIU. Id. at 1397-99, 1401-03. By contrast, nothing in plaintiffs' complaints suggest that the Rating Agencies explicitly assumed the responsibilities of underwriters. Plaintiffs' allegations that the Rating Agencies assumed the historic role of underwriters by evaluating loan data and assisting in the creation of the securities falls well short of alleging that the Agencies — explicitly, or otherwise — participated in the distribution of the securities. See, e.g., New Jersey Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d 254, 263 (S.D.N.Y. 2010) (concluding that allegations that "Moody's and S&P played a significant, if not major, role in initial securitization decisions" was insufficient to create underwriter liability when plaintiffs made "no factual allegation" regarding rating agencies' participation in sale or distribution of securities, such as "assisting in investor 'road shows,' or purchasing the securities themselves for re-sale"). Indeed, unlike in Harden, all of the certificate transactions here at issue involved traditional underwriters other than the Rating Agencies.

Nor are we persuaded that Pinter v. Dahl, 486 U.S. 622 (1988), requires a different result. There, the Supreme Court declined to extend § 12(1)'s liability provision for "sellers" of unregistered securities to anyone "whose participation in the buy-sell transaction is a substantial factor in causing the transaction to take place." Id. at 648-51 (internal quotation

23

marks omitted).[9] Explaining that nothing in § 12(1)'s language suggested imposing liability on "participants collateral to the offer or sale," the Court stated that, in contrast, Congress employed "the collateral participation concept" in other provisions of the 1933 Act. Id. at 650 & n.26. The Court then noted that § 11's inclusion of "many who are participants in the activities leading up to the sale" lent "strong support" to its conclusion that § 12 imposed no similar participant liability. Id. at 650 n.26.

Unlike plaintiffs, we do not interpret this discussion as supporting imposition of § 11 underwriter liability on everyone playing a facilitating role in the eventual sale or offer of securities. First, Pinter's discussion of § 11 participant liability was confined to a footnote and is dictum. See Central Va. Cmty. Coll. v. Katz, 546 U.S. 356, 363 (2006) ("[W]e are not bound to follow our dicta in a prior case in which the point now at issue was not fully debated."); Sai Kwan Wong v. Doar, 571 F.3d 247, 257 (2d Cir. 2009). Second, the Court's statement that § 11, as opposed to § 12, imposes participant liability does not answer the question: participation in what? A plain reading of the text points us to one answer: participation in the distribution of securities, either through the purchase of securities from an issuer with a view towards distribution, the sale or offer of such securities by an issuer, or the underwriting of such undertakings.

---

[9] Section 12(a)(1) states that any person selling unregistered securities in violation of 15 U.S.C. § 77e "shall be liable . . . to the person purchasing such security from him, who may sue either at law or in equity in any court of competent jurisdiction, to recover the consideration paid for such security with interest thereon, less the amount of any income received thereon, upon the tender of such security, or for damages if he no longer owns the security." 15 U.S.C. § 77l(a)(1).

## c. Legislative History and Purpose

Even if we were to identify ambiguity in the text or in our prior case law, which we do not, an examination of § 11's legislative history and purpose reinforces our holding that the Rating Agencies do not qualify as 'underwriters.' See, e.g., General Dynamics Land Sys., Inc. v. Cline, 540 U.S. 581, 600 (2004) (interpreting statute in light of "text, structure, purpose, and history"); Slayton v. Am. Express Co., 604 F.3d 758, 770-71 (2d Cir. 2010). In so analyzing the statute, we are mindful that although the securities laws are interpreted expansively to "effectuate their remedial purposes," the "ultimate question is one of congressional intent, not one of whether" the court can improve the law. Pinter v. Dahl, 486 U.S. at 653 (internal quotation marks and brackets omitted). Moreover, while the term "underwriter" is interpreted broadly, "it must be read in relation to the underwriting function that [it] is intended to capture." In re Refco, Inc. Sec. Litig., 2008 WL 3843343, at *4.

A House Report explains that "underwriter" was "defined broadly enough to include not only the ordinary underwriter, who for a commission promises to see that an issue is disposed of at a certain price, but also . . . the person who purchases an issue outright with the idea of then selling that issue to the public." H.R. Rep. No. 73-85, at 13 (1933). Additionally, the definition encompassed "two other groups of persons who perform functions, similar in character, in the distribution:" (1) underwriters of the underwriter, and (2) "participants in the underwriting or outright purchase . . . who are given a certain share or interest." Id. A later House Report states that changes were made to exclude from the

25

definition those who merely furnish an underwriter money, and to adopt a test "of participation in the underwriting undertaking rather than that of a mere interest in it." H.R. Rep. No. 73-152, at 24 (1933).

By focusing on persons playing roles similar to those disposing of or reselling securities, or those participating in such actions, these reports indicate that "congressional intent was to include as underwriters all persons who might operate as conduits for securities being placed into the hands of the investing public." 2 Thomas Lee Hazen, Law of Securities Regulation § 4.27[1] (6th ed. 2011) (emphasis added); see Ackerberg v. Johnson, 892 F.2d 1328, 1335-36 (8th Cir. 1989) (same); see also New Jersey Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d at 262-63 & n.7 (concluding that § 11's legislative history suggests underwriter definition "revolves around the sale and distribution of securities"). In short, Congress did not intend for strict underwriter liability to extend to persons merely interested in a distribution by virtue of their provision of non-distribution services to an offeror. See In re Worldcom Sec. Litig., 308 F. Supp. 2d at 344 ("Having a relationship with an issuer or underwriter . . . does not transform one into an underwriter.").

"Indeed, the strict liability nature of the statutory cause of action suggests the opposite." Pinter v. Dahl, 486 U.S. at 652. As we have previously noted, § 11 ensures accurate disclosures in registration statements by imposing in terrorem liability on a limited list of persons. See In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359-60; see also Herman & MacLean v. Huddleston, 459 U.S. at 381-82 & n.13 (noting that § 11, "designed

26

to assure compliance with" disclosure provisions, "can be brought only against the issuer, its directors or partners, underwriters, and [named experts]"). To be sure, "direct or indirect participation" in underwriting subjects a person to strict liability. 15 U.S.C. § 77b(a)(11). But the participation must be in the statutorily enumerated distributional activities, not in non-distributional activities that may facilitate the eventual distribution by others. This approach avoids the implausible result of transforming every lawyer, accountant, and other professional whose work is theoretically "necessary" to bringing a security to market into an "underwriter" subject to strict liability under § 11, a dramatic outcome that Congress provided no sign of intending. Rather, the legislative history signals that § 11 was designed to impose its exacting standards regarding the provision of accurate and complete information only on the people (or entities) responsible for distributing securities to the public, that is, on those engaged in the public offering. See H.R. Rep. No. 73-85, at 5 (noting that 1933 Act's civil liabilities impose fiduciary-like responsibilities on "all those responsible for statements upon the face of which the public is solicited to invest its money," namely, "directors of the issues, its experts, and the underwriters who sponsor the issue"); id. at 22 (noting that § 11 liability is imposed "against those responsible for a false or misleading statement" because a security's value is affected by registration statement's information).[10]

---

[10] Contrary to plaintiffs' suggestion, limiting liability to those who participate in the listed distributional activities does not render the direct or indirect participation prong of the underwriter definition superfluous. Persons may be liable for participation even though they did not themselves directly sell or offer securities or purchase securities for resale. For example, defendants might "participate" in underwriting by referring investors to sellers or offerors for a fee, cf. Sirianni v. SEC, 677 F.2d 1284, 1287 (9th Cir. 1982); organizing

27

In sum, we conclude that the text, case law, legislative history, and purpose of the statute demonstrate that Congress intended the participation clause of the underwriter definition to reach those who participate in purchasing securities with a view towards distribution, or in offering or selling securities for an issuer in connection with a distribution, but not further.

### 2. Application of Underwriter Definition to Defendants' Alleged Conduct

With this understanding of the scope of § 11 liability, we consider plaintiffs' challenge to the dismissal of their complaints against the Rating Agencies. As an initial matter, we reject as meritless Wyoming's contention that the district court ignored the statute's participation clause in holding that "the Rating Agencies did not purchase the securities . . . from the issuer with a view to their resale." Wyoming Br. at 20 (internal quotation marks omitted). Wyoming misquotes the district court's opinion, which noted plaintiffs' reliance on the participation language in identifying "nothing . . . to suggest that [defendants] participated in the relevant 'undertaking' – that of purchasing the securities" for resale. In re Lehman Bros. Sec. & ERISA Litig., 681 F. Supp. 2d at 499 (emphasis added). We are similarly unpersuaded by Vaszurele's argument that the district court erroneously limited its

---

selling efforts, cf. Geiger v. SEC, 363 F.3d 481, 487 (D.C. Cir. 2004) (concluding defendant participated in distribution of unregistered securities by finding buyer, negotiating terms, and facilitating resale); SEC v. Int'l Chem. Dev. Corp., 469 F.2d 20, 31 (10th Cir. 1972) (concluding defendant participated in distribution of unregistered securities by role in publicizing company and interacting with transfer agent); or acting as an intermediary in a purchase of securities for resale. As discussed in the next section, this case presents none of these circumstances.

analysis to whether defendants participated in purchasing securities for resale without considering if they participated in offering or selling securities for the issuers. Even if that had been the case, it affords plaintiffs no relief. On appeal, we may "affirm a decision on any grounds supported in the record." 10 Ellicott Square Court Corp. v. Mountain Valley Indem. Co., 634 F.3d 112, 125 (2d Cir. 2011). Applying the underwriter definition on de novo review, we conclude that plaintiffs failed to allege facts sufficient to state a plausible § 11 claim against the Rating Agency defendants.

The complaints contain extensive descriptions of the Rating Agencies' activities in structuring the certificate transactions, dictating the kinds and quantity of loans or credit enhancements needed for desired ratings, and providing modeling tools to traders to pre-structure loan pools. Plaintiffs submit that these allegations demonstrate that the Rating Agencies played a necessary role in the securities' distribution because (1) their ratings translated opaque financial products into understandable risk levels, (2) institutional investors were required to buy investment-grade securities, and (3) offerings were conditioned on senior tranches receiving AAA ratings. We disagree. Like all of the district courts to have considered similar claims, we conclude that structuring or creating securities does not constitute the requisite participation in underwriting. See, e.g., New Jersey Carpenters Health Fund v. NovaStar Mortg., Inc., No. 08 Civ. 5310, 2011 WL 1338195, at *7-9 (S.D.N.Y. Mar. 31, 2011); Public Emps.' Ret. Sys. of Miss. v. Goldman Sachs Grp., Inc., No. 09 CV 1110, 2011 WL 135821, at *5 (S.D.N.Y. Jan. 12, 2011); Public Emps.' Ret. Sys. of

Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d 475, 481-83 (S.D.N.Y. 2010); In re Wells

Fargo Mortg.-Backed Certificates Litig., 712 F. Supp. 2d 958, 968-69 (N.D. Cal. 2010); New

Jersey Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d at 262-

64; In re Lehman Bros. Sec. & ERISA Litig., 681 F. Supp. 2d at 497-99.

As the district court in this case explained, even assuming, as we must, that the Rating

Agencies "had a good deal to do with the composition and characteristics of the pools of

mortgage loans and the credit enhancements of the [c]ertificates that ultimately were sold,"

plaintiffs failed to allege that defendants "participated in the relevant" undertaking: that of

purchasing securities from the issuer with a view towards distribution, or selling or offering

securities for the issuer in connection with a distribution. In re Lehman Bros. Sec. & ERISA

Litig., 681 F. Supp. 2d at 499; see also In re Wells Fargo Mortg.-Backed Certificates Litig.,

712 F. Supp. 2d at 968-69 (dismissing § 11 claims when plaintiffs failed to allege rating

agencies undertook "activities related to the [securities'] distribution or sale"); New Jersey

Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d at 263-64

(concluding that playing "significant role in the creation" of certificates does not constitute

requisite "participat[ion] in the sale or distribution" of securities). The Rating Agencies'

efforts in creating and structuring certificates occurred during the initial stages of

securitization, not during efforts to disperse certificates to investors. See New Jersey

Carpenters Vacation Fund v. Royal Bank of Scot. Grp., PLC, 720 F. Supp. 2d at 263-64

(noting that certificate creation occurred during "securitization process" rather than during marketing, distribution, or sale (internal quotation marks omitted)).

The fact that the market needed ratings to understand structured financial products or that particular ratings were essential to the certificates' eventual sale does not change the analysis. While it is certainly true that some investors will refrain from buying securities that do not bear a AAA rating, and that some banks will decline to assume the risk of pursuing a public offering unless a security receives a high credit rating, plaintiffs, once again, fail to demonstrate that the Rating Agencies were involved in a statutorily listed distributional activity.

The rating issued by a Rating Agency speaks merely to the Agency's opinion of the creditworthiness of a particular security. In other words, it is the sort of expert opinion classically evaluated under the "expert" provision of § 11, not under the "underwriter" provision. See 15 U.S.C. § 77k(a)(4) (providing for "expert" liability against "accountant[s], engineer[s], or appraiser[s], or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement."); see also id. § 77g(a) (providing requirements by which "consent" must be established for purposes of § 77k(a)(4)).[11] Indeed, each offering document

---

[11] As explained above, the issuance of a credit rating ostensibly falls within the "expert" category of potential liability under § 11. In 1981, the SEC announced a new policy intended to encourage the disclosure of security ratings in registration statements. In so doing, however, the SEC promulgated Rule 436(g), which provides that credit ratings are not to be considered part of the registration statement "prepared or certified by a person within the meaning of sections 7 and 11 of the [1933] Act." 17 C.F.R. § 230.436(g)(1). The

explained that the assigned credit rating was "not a recommendation to buy, sell or hold securities and may be subject to revision or withdrawal at any time." See, e.g., Defs.' Br. at 7.

Furthermore, expanding § 11 to cover the conduct of the Rating Agencies would contradict that section's specific enumeration of liable parties, which does not include a number of persons necessary to the creation of securities, such as banks that originated the underlying loans, traders who structured the transactions, or experts who did not consent to being named. See 15 U.S.C. § 77k(a); Public Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co., 714 F. Supp. 2d at 482 (dismissing § 11 underwriter claim against sponsoring entities that originated or acquired underlying loans); In re Refco, Inc. Sec. Litig., 2008 WL 3843343, at *3-5 & n.5 (dismissing § 11 claim involving attorneys who allegedly helped draft documents, noting that such claims are usually analyzed under expert liability prong).[12]

_____

express purpose of the Rule was to "exclude any [rating agency] whose security rating is disclosed in a registration statement from civil liability under Section 11." SEC Proposal Release No. 33-6336, 46 Fed. Reg. 42024, 42024 (Aug. 18, 1981). Perhaps it is because this Rule, still in effect at the time plaintiffs brought the instant lawsuits, prevented plaintiffs from suing the Rating Agencies under the "expert" prong, that they urged new theories of liability under the "underwriter" and "control person" provisions. Indeed, even though Rule 436(g) was recently nullified by The Dodd-Frank Wall Street Reform and Consumer Protection Act, see Pub. L. No. 111-203, § 939G, 124 Stat. 1376, 1890 (2010) (providing that "Rule 436(g) . . . shall have no force or effect"), it appears that any potential "expert" liability requires satisfaction of the naming and consent requirements, see 15 U.S.C. § 77k(a)(4); see also 15 U.S.C. § 77g(a) (requiring that "written consent" of named experts be filed with registration statement). Plaintiffs do no allege that the Rating Agencies provided such consent.

[12] Plaintiffs' attempts to distinguish Refco, a case on which the district court relied, are unavailing. In that case, the district court dismissed a § 11 claim alleging that attorneys

Because plaintiffs' theory would render these narrowly drawn categories meaningless and contradict well-settled canons of statutory construction, see, e.g., Corley v. United States, 129 S. Ct. 1558, 1566 (2009) (noting that "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant" (internal quotation marks omitted)); Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 49 (2d Cir. 2010), we decline to adopt it. Rather, we conclude that the mere structuring or creation of securities does not constitute participation in statutory underwriting.

For the same reason, we reject Wyoming's claim that the Rating Agencies' alleged review of and comments on draft prospectus supplements incorporated into the registration statements stated a § 11 claim. Similarly, we reject the Union Plaintiffs' conclusory pleading that S&P and Moody's are liable under § 11 for their alleged participation in drafting and disseminating offering documents. As discussed, § 11 imposes strict liability only on enumerated parties, excluding "certain individuals who play a part in preparing the registration statement," such as "corporate officers other than those" specified and experts "not named as having prepared or certified" any part of the registration statement. Herman & MacLean v. Huddleston, 459 U.S. at 386 n.22; see also In re Refco, Inc. Sec. Litig., 2008

participated in underwriting by commenting on a registration statement because drafting offering documents did not constitute participation in purchasing securities for resale. See In re Refco, Inc. Sec. Litig., 2008 WL 3843343, at *3. Plaintiffs here submit that the Rating Agencies' role in creating securities is not equivalent to commenting on a draft registration statement. That may be true. But any difference in the type of participation is immaterial when neither the attorneys in Refco nor the Rating Agencies here took part in distributing securities to the public. See id. at *4.

33

WL 3843343, at *3. Holding "the myriad of participants in the drafting process" strictly liable would eviscerate the "specific categories of individuals defined in § 11 as the proponents of the [registration] statement," making "anyone who commented on a draft statement, however innocently, a guarantor of every assertion" therein. In re Refco, Inc. Sec. Litig., 2008 WL 3843343, at *3. Accordingly, we conclude that merely commenting on draft offering documents does not constitute the requisite participation in underwriting.

Contrary to plaintiffs' assertion, this conclusion will not absolve rating agencies of all liability for their roles in fraudulent securities offerings. As plaintiffs acknowledged at oral argument, they may bring securities fraud claims against the Rating Agencies pursuant to § 10(b) of the Securities Exchange Act of 1934 ("1934 Act"), although liability under that section is, of course, subject to scienter, reliance, and loss causation requirements not applicable to § 11 claims. See Herman & MacLean v. Huddleston, 459 U.S. at 382 (noting "catch-all" § 10(b) provision can be brought against "any person" using deception in connection with securities sale (internal quotation marks and emphasis omitted)). It is precisely because § 11 "give[s] rise to liability more readily," however, that it is applies "more narrowly" than § 10(b). In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d at 359-60.

In sum, because plaintiffs failed to plead facts sufficient to bring the Rating Agencies within the statutory definition of underwriter, their § 11 claims against these defendants were properly dismissed.

C.    Section 15 Control Person Claims

The Union Plaintiffs and Wyoming also appeal the district court's dismissal of their

§ 15 control person claims against the Rating Agencies. Section 15 imposes joint and several

liability on "[e]very person who, by or through stock ownership, agency, or otherwise . . .

controls any person liable under" § 11. 15 U.S.C. § 77o(a).[13]  To establish § 15 liability, a

plaintiff must show a "primary violation"of § 11 and control of the primary violator by

defendants.  ECA & Local 134 IBEW Joint Pension Trust v. JP Morgan Chase Co., 553 F.3d

187, 206-07 (2d Cir. 2009); see also In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d

at 358.  Because it is undisputed that plaintiffs adequately pleaded primary § 11 violations

by the certificates' issuers or depositors, the only question on appeal is whether the facts

alleged permit an inference that the Rating Agencies controlled the primary violators.

Although our Court has not yet discussed "control" for § 15 purposes, in the context

of claims under § 20(a) of the 1934 Act against persons controlling primary § 10(b) violators,

---

[13] Section15(a) states as follows:

Every person who, by or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or understanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77l of this title, shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person had no knowledge of or reasonable ground to believe in the existence of the facts by reason of which the liability of the controlled person is alleged to exist.

15 U.S.C. § 77o(a).

we have defined "control" as "'the power to direct or cause the direction of the management and policies of [the primary violators], whether through the ownership of voting securities, by contract, or otherwise.'" SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Because § 15 and § 20(a) are roughly parallel control person provisions under the 1933 and 1934 Acts, respectively, we here adopt the quoted First Jersey definition of control for § 15 claims. See 15 U.S.C. § 77o(a) (imposing liability on persons who "control[] any person liable" under §§ 11 or 12); id. § 78t (imposing liability on persons who "control[] any person liable" under § 10(b)); In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d 611, 660 (S.D.N.Y. 2007) (noting that § 20(a) and § 15 "are parallel provisions").

The parties dispute whether we should further adopt the requirement that § 20 plaintiffs demonstrate "culpable participation" by the alleged controlling person for purposes of § 15. See SEC v. First Jersey Sec., Inc., 101 F.3d at 1472 (requiring § 20 plaintiff to show that "controlling person was in some meaningful sense a culpable participant in the fraud perpetrated by the controlled person" (internal quotation marks and brackets omitted)). That issue has divided district courts in this Circuit. Compare P. Stolz Family P'ship, L.P. v. Daum, 166 F. Supp. 2d 871, 873 (S.D.N.Y. 2001) (requiring culpable participation), reversed in part on other grounds by 355 F.3d 92 (2d Cir. 2004), with In re Refco, Inc. Sec. Litig., 503 F. Supp. 2d at 660-61 & n.43 (noting that despite similarity between § 15 and § 20(a), "culpable participation" requirement applies only to § 20(a) because § 20(a) excepts from

36

liability those acting "in good faith" who did not directly or indirectly induce violation (emphasis in original)); In re CINAR Corp. Sec. Litig., 186 F. Supp. 2d 279, 309-10 (E.D.N.Y. 2002) (declining to require culpable participation because § 11, unlike § 10(b), does "not contain an intent element"). We need not decide here whether "culpable participation" is a necessary element for § 15 liability because plaintiffs' § 15 claims fail in any event for inadequate pleading of the undisputed element of control.

Plaintiffs contend that the district court erroneously applied a heightened pleading standard by requiring their complaints to support an inference "that the decision making power lay entirely with the Rating Agencies." In re Lehman Bros. Sec. & ERISA Litig., 681 F. Supp. 2d at 501 (emphasis added). Unlike plaintiffs, we do not understand the district court's passing reference to "entire" control to require a pleading that defendants controlled the primary violators to the exclusion of all others. The district court correctly observed that § 15 imposes liability on "'[e]very person'" who controls a primary violator. Id. at 500 (quoting 15 U.S.C. § 77o) (emphasis added). Moreover, the district court analyzed explicitly whether plaintiffs pleaded "allegations . . . sufficient to justify a conclusion that the Rating Agencies controlled others who violated [§ 11]." Id. In any event, after de novo review we conclude that plaintiffs' allegations are insufficient.

Wyoming alleges that defendants "actively collaborated" with the depositors in creating the transactions by providing "direct input," "advisory opinions," and "guidance" on which loans or structures would achieve desired ratings. Wyoming Compl. ¶¶ 47-49, 64,

89, 97.[14]  The Union Plaintiffs similarly allege that the Rating Agencies influenced the primary violators by providing advice and feedback on appropriate loan prices and structures, thereby "largely determin[ing] the amount and kind of credit enhancement" that would result in specific ratings.  Union Compl. ¶¶ 173-75, 178.

At most, these allegations suggest that the Rating Agencies provided advice and "strategic direction," Wyoming Br. at 32, on how to structure transactions to achieve particular ratings.  Such purported involvement in transaction-level decisions falls far short of showing a power to direct the primary violators' "management and policies."  SEC. v. First Jersey Sec., Inc., 101 F.3d at 1472-73 (emphasis added); see Boilermakers Nat'l Annuity Trust Fund v. WaMu Mortg. Pass Through Certificates, Series AR1, 748 F. Supp. 2d 1246, 1260 (W.D. Wash. 2010) (dismissing control person claims because allegations that rating agencies "determined the structure and credit support" of transactions "simply d[id] not implicate [violator's] management or policies" (internal quotation marks omitted)); In re Wells Fargo Mortg.-Backed Certificates Litig., 712 F. Supp. 2d at 970 (dismissing control

---

[14] Wyoming also alleges that the Rating Agencies controlled "parties to the securitization transaction[s]" because (1) offering documents required written notice to the Rating Agencies of a trustee's resignation and (2) the pooling and servicing agreements could not be amended and the servicer could not resign without letters from the Rating Agencies confirming that such actions would not result in a rating downgrade.  Wyoming Compl. ¶¶ 101-04.  Wyoming forfeited any arguments regarding these allegations by failing to raise them on appeal.  See, e.g., Nationwide Mut. Ins. Co. v. Mortensen, 606 F.3d at 28-29.  In any event, we identify no basis to conclude that contractual provisions requiring notice to or letters from the Rating Agencies when specific events occur manifest control by defendants over the primary violators' management or policies.

person claims because allegations of rating agencies' influence over transactions failed to show direction of violators' management or policies).

Moreover, allegations of advice, feedback, and guidance fail to raise a reasonable inference that the Rating Agencies had the power to <u>direct</u>, rather than merely inform, the banks' ultimate structuring decisions. Put another way, providing advice that the banks chose to follow does not suggest control. <u>See</u> <u>Harrison v. Dean Witter Reynolds, Inc.</u>, 974 F.2d 873, 877 (7th Cir. 1992) ("[T]he ability to persuade and give counsel is not the same thing as 'control' . . . ." (internal quotation marks omitted)); <u>New Jersey Carpenters Health Fund v. Residential Capital, LLC</u>, No. 08 CV 8781, 2010 WL 1257528, at *7 (S.D.N.Y. Mar. 31, 2010) (dismissing control person claim against underwriters because ability to persuade issuers insufficient).[15]

Indeed, plaintiffs' "ratings shopping" allegations undermine their control theory. Specifically, plaintiffs allege that the banks wielded "incredible leverage over," Wyoming Compl. ¶ 195, and "pressured" the Rating Agencies, Union Compl. ¶ 168, by awarding business to the agency providing the highest percentage of AAA ratings with the lowest levels of credit enhancement. Such allegations might suggest that the <u>primary violators</u> had

---

[15] We need not here decide if some level of "influence" absent "actual control" might establish § 15 liability. <u>Compare</u> <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 487 (S.D.N.Y. 2005) (noting that "exercise of influence, without power to direct . . . management and policies" insufficient to establish control), <u>with</u> <u>In re Adelphia Commc'ns Corp. Sec. & Derivative Litig.</u>, 398 F. Supp. 2d 244, 262 (S.D.N.Y. 2005) (concluding that control may be shown through "the potential power to influence and direct" primary violators (internal quotation marks omitted)). To the extent this distinction has meaning, plaintiffs' allegations of advice and guidance fail to raise a reasonable inference of control under either standard.

power over the <u>Rating Agencies'</u> policies by "engendering a race to the bottom in terms of rating quality." Wyoming Compl. ¶ 170. But they do not support any inference that the Rating Agencies had the power to direct the primary violators' policies.

Nor are we persuaded by the Union Plaintiffs' argument that they adequately alleged control by stating that SASCo was a "dummy corporation" with the sole purpose of securitizing transactions. The complaint does not, in fact, allege that SASCo was a "dummy corporation," <u>see</u> <u>Manning v. Utils. Mut. Ins. Co.</u>, 254 F.3d 387, 401 (2d Cir. 2001) (noting that allegations must be contained in complaint to defeat motion to dismiss), nor does it plead facts suggesting that SASCo was a shell company created to avoid liability for securities law violations, <u>cf.</u> <u>In re Refco, Inc. Sec. Litig.</u>, 503 F. Supp. 2d at 661 (concluding defendants could be liable when they allegedly controlled entities exercising power over shell entities). In any event, the complaint alleges that Lehman wholly owned SASCo and "controlled every aspect of the securitization," without alleging that the Rating Agencies created SASCo or directed its management or policies. Union Compl. ¶ 6. Such allegations do not raise a reasonable inference that the Rating Agencies controlled SASCo.

Accordingly, we affirm the district court's dismissal of the control person claims.

D.     <u>Leave to Replead</u>

All plaintiffs charge the district court with error in denying leave to amend. We review such a denial only for abuse of discretion, <u>see</u> <u>Chavis v. Chappius</u>, 618 F.3d 162, 167

40

(2d Cir. 2010); Sims v. Blot (In re Sims), 534 F.3d 117, 132 (2d Cir. 2008) (describing abuse of discretion standard), which we do not identify here.

In their briefs in opposition to the motions to dismiss, plaintiffs requested leave to amend without specifying what additional facts, if any, they might assert in a new pleading. As we have previously ruled, "[i]t is within the [district] court's discretion to deny leave to amend implicitly by not addressing" requests for amendment made "informally in a brief filed in opposition to a motion to dismiss." Joblove v. Barr Labs. Inc. (In re Tamoxifen Citrate Antitrust Litig.), 466 F.3d 187, 220 (2d Cir. 2006); see also Litwin v. Blackstone Grp., L.P., 634 F.3d 706, 723 (2d Cir. 2011). Where, as here, the district court did not specify in its decisions that it dismissed the complaints with prejudice, and plaintiffs thereafter failed to make formal motions to amend or to offer proposed amended complaints, we identify no abuse of discretion in the district court's implicit denial of plaintiffs' cursory requests for leave to amend.

In any event, a denial of leave to amend is not an abuse of discretion if amendment would be futile. See In re Tamoxifen Citrate Antitrust Litig., 466 F.3d at 220. While plaintiffs' conclusorily assert on appeal that recent government investigations provide new information about the Rating Agencies' role in the transactions, they fail to identify new facts that might redress the complaints' noted deficiencies. Accordingly, we reject as without merit plaintiffs' challenge to the denial of leave to amend.

## III.   Conclusion

To summarize, we conclude as follows:

1.     To qualify as an "underwriter" under 15 U.S.C. § 77b(a)(11), a person must have participated, directly or indirectly, in the purchase of securities with a view toward distribution, or in the sale or offer of securities in connection with a distribution.  Because the Rating Agencies' alleged structuring or creation of securities was insufficient to demonstrate their involvement in the requisite distributional activities, plaintiffs' § 11 claims against these defendants were properly dismissed.

2.     Because the Rating Agencies' provision of advice and guidance regarding transaction structures was insufficient to permit an inference that they had the power to direct the management or policies of alleged primary violators of § 11, plaintiffs' "control person" claims against these defendants pursuant to 15 U.S.C. § 77o(a) were properly dismissed.

3.     The district court did not abuse its discretion in denying implicitly plaintiffs' cursory requests for leave to amend.

AFFIRMED.