PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 18-1849

———————

OBASI INVESTMENT LTD; JINGLI SHAO; ROBIN
JOACHIM DARTELL; LIXIN WU; JASON HELTON;
SEAN CARITHERS, individually and on behalf of all others
similarly situated

v.

TIBET PHARMACEUTICALS, INC; HONG YU;
TAYLOR Z. GUO; SABRINA REN;
WENBO CHEN; YOUHANG PEN; SOLOMON CHEN;
ANDERSON & STRUDWICK INC;
STERNE AGEE GROUP INC; HAYDEN ZOU;
L. MCCARTHY DOWNS, III; ACQUAVELLA CHIARELLI
SHUSTER BERKOWER & CO., L.L.P.,

HAYDEN ZOU; L. MCCARTHY DOWNS, III,
                    Appellants

———————

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 2-14-cv-03620)
District Judge: Hon. John M. Vazquez

———————

Argued February 12, 2019
Before: HARDIMAN, SCIRICA, and COWEN, *Circuit Judges*.

(Filed: July 23, 2019)

A. Neil Hartzell **[Argued]**
Freeman Mathis & Gary
60 State Street, 6th Floor
Boston, MA 02109
    *Attorney for Appellant L. McCarthy Downs, III*

Michael P. Tremonte **[Argued]**
Justin J. Gunnell
Sher Tremonte
90 Broad Street, 23rd Floor
New York, NY 10004
    *Attorneys for Appellant Hayden Zou*

Laurence M. Rosen **[Argued]**

Rosen Law Firm
609 W. South Orange Avenue, Suite 2P
South Orange, NJ 07079

Keith R. Lorenze
Rosen Law Firm
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
    *Attorneys for Appellees*

―――――――

OPINION OF THE COURT

―――――――

HARDIMAN, *Circuit Judge*.

This case comes to the Court as a certified interlocutory appeal. The sole question presented is whether, under Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, a nonvoting board observer affiliated with an issuer's placement agent is a "person who, with his consent, is named in the registration statement as being or about to become a director[ ] [or] person performing similar functions . . . ." *Id.* § 77k(a)(3).

We think not. As required by the text of § 77k(a)(3), our inquiry begins and ends with the registration statement's description of the Defendants. We hold as a matter of law that the Defendants' functions are not "similar" to those that board directors perform, so we will reverse the District Court's order and direct the entry of summary judgment for the Defendants.

I[1]

Tibet Pharmaceuticals, Inc. is a holding company. Through an array of parent-subsidiary relationships and

―――――――

[1] The District Court had jurisdiction under 28 U.S.C. § 1331. We have jurisdiction under 28 U.S.C. § 1292(b) and exercise plenary review over the question certified. *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 621 F.3d 296, 301 (3d Cir. 2010). We review the District Court's denial of summary judgment de novo, applying the same standard it

3

contractual rights, Tibet "effectively control[led]" Yunnan Shangri-La Tibetan Pharmaceutical Group Limited (Yunnan), an operating company that manufactured and sold traditional Tibetan medicines. *Dartell v. Tibet Pharm., Inc.*, 2017 WL 1944106, at *2 (D.N.J. May 10, 2017). This case involves Tibet's attempt to raise capital for those operations through an initial public offering (IPO).

Hayden Zou was an early investor in Tibet and the sole director of China Tibetan Pharmaceuticals Limited, a wholly owned subsidiary of Tibet. Tibet's ability to control Yunnan flowed through China Tibetan. In late 2009, Zou told L. McCarthy Downs, III, a managing director at the investment bank Anderson & Strudwick, Inc. (A&S), about Tibet. The two discussed the prospect of a Tibet IPO, and A&S later agreed to serve as Tibet's placement agent. Zou and Downs then worked together to bring Tibet public. Tibet's IPO registration statement became effective in late 2010.

Zou and Downs were neither signatories to the registration statement nor named in it as directors of Tibet. Instead, they were listed as nonvoting board observers chosen by A&S. Though Zou and Downs would have no formal powers or duties, the registration statement explained "they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval." App. 178.

---

should apply. *See Gruber v. Price Waterhouse*, 911 F.2d 960, 963 (3d Cir. 1990).

4

As it turned out, the registration statement[2] omitted material negative information about Yunnan's finances. Yunnan had defaulted on a loan from the Chinese government a few months before Tibet's registration statement became effective and that default led to a judgment that required repayment within 60 days. Though the registration statement described a "long term loan," it said nothing about the default judgment.

Just before Tibet filed its amended final prospectus, the Chinese government froze all of Yunnan's assets. Tibet did not disclose that either. The IPO closed soon thereafter, and Tibet and its underwriters offered 3 million shares to the public at $5.50 per share. But Yunnan still hadn't paid what it owed, so the Agricultural Bank of China auctioned off the company's assets. This prompted the NASDAQ to halt trading in Tibet's stock, and its price plummeted.

Plaintiffs sued Zou, Downs, Tibet, A&S, the IPO's auditor, and several other Defendants on behalf of a class of stock purchasers. As relevant to this certified interlocutory

---

[2] We note the District Court used the term "prospectus," not "registration statement" for the central document in this case. That was accurate, but for our purposes there is no difference between the two. That's because Tibet's amended final prospectus, filed post-effectiveness under Rule 424, is considered part of its registration statement. *See* Regulation C, 17 C.F.R. §§ 230.404, 230.430B(d). Because this appeal concerns Securities Act § 11 registration statement liability, not § 12 prospectus liability, we use the term "registration statement" to avoid confusion. We use the term "final prospectus" in the next paragraph for chronological clarity.

5

appeal, Plaintiffs alleged Zou and Downs violated Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k(a).

II

Section 11 imposes near-strict liability for untruths and omissions made in a registration statement. *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006). Unlike antifraud cases, a § 11 plaintiff need not allege scienter, reliance,[3] or loss causation. *See In re Constar Int'l Inc. Sec. Litig.*, 585 F.3d 774, 782–783 (3d Cir. 2009); *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010). Congress imposed this *in terrorem* liability on those best positioned to ensure accurate disclosure. *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 181 (2d Cir. 2011) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 381–82 & n.13 (1983)).

Because § 11 is such strong medicine, and to meet its purpose of enforcing accurate registration statement disclosure, it applies only to limited and enumerated categories of defendants. *See Herman & MacLean*, 459 U.S. at 381–82; *Lehman Bros.*, 650 F.3d at 185 ("It is precisely because § 11 'gives rise to liability more readily,' however, that it is [sic] applies 'more narrowly' than § 10(b)." (quoting *Morgan Stanley*, 592 F.3d at 359–60)). Among those defendants is "every person who, with his consent, is named in the registration statement as being or about to become a director,

---

[3] Unless they bought their securities more than 12 months after the registration statement became effective, 15 U.S.C. § 77k(a).

6

person performing similar functions, or partner." 15 U.S.C. § 77k(a)(3).

The District Court, finding there were material issues of fact about whether Zou and Downs had been named as people "performing similar functions to a director," *Dartell*, 2017 WL 1944106, at \*12, denied summary judgment. At the outset, the Court held that only the Defendants' description in the registration statement itself is relevant to the inquiry. Turning to the merits, the Court observed Zou and Downs were named in the registration statement as about to become "board observers" appointed by Tibet's placement agent. In a section titled "Relationship with our Placement Agent," the registration statement describes their role:

> **We will have an ongoing relationship with our Placement Agent that may impact our shareholders' ability to impact decisions related to our operations.**
>
> In connection with this offering, we have agreed to allow our Placement Agent to designate two non-voting observers to our Board of Directors until the earlier of the date that: (i) the investors that purchase shares in this offering beneficially own less than five percent (5%) of our outstanding shares; or (ii) the trading price per share is at least [$24 per share] for any consecutive 15 trading day period. Although our Placement Agent's observers will not be able to vote, they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval.

App. 178; *see* App. 230.

After acknowledging that Zou and Downs would not be able to vote, the District Court observed "they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval." *Dartell*, 2017 WL 1944106, at *10. In the Court's view, because Zou and Downs had the power to "influence," this meant they "arguably had more influence than any individual board member, who could only cast a single vote." *Id.* "The Court's only hesitation" in denying summary judgment was that the registration statement used the word "may" rather than "shall" or "will." *Id.* at *11. That meant it "was not necessarily mandatory that the Board Observers exercise their 'significant influence.'" *Id.* Still, the Court determined that whether Zou and Downs were covered by § 11 was a jury question. *Id.*

Zou and Downs moved for certification of that order under 28 U.S.C. § 1292(b). The District Court granted the motion, finding the underlying legal question—whether Zou and Downs could be liable under § 11—met the requirements of § 1292(b). First, the District Court found the question was a controlling question of law, because its conclusion would create reversible error if we disagreed on appeal. Second, the District Court found there was substantial ground for difference of opinion, despite the question being one of first impression in the courts of appeals, because "Section 11 is narrowly construed" and reasonable jurists could therefore disagree with its conclusion. *Dartell v. Tibet Pharm., Inc.*, 2018 WL 994896, at *5 (D.N.J. Feb. 21, 2018). Finally, the Court thought an interlocutory appeal would materially advance the ultimate termination of the litigation, because it had already

8

granted summary judgment for Zou and Downs on all counts save the one alleging § 11 liability. If we disagreed with the District Court, the litigation would thus be at an end. So the District Court certified the following question:

> Can Defendants be potentially liable under Section 11 of the Securities Act of 1933, each as a "person performing similar functions" to a director, in light of Defendants' role as board observers who could (but did not necessarily have to) significantly influence the outcome of matters submitted to the board of directors for approval?

Order at 2, No. 2-14-cv-03620 (D.N.J. Feb. 21, 2018), ECF No. 313. We granted Zou and Downs's timely Petition for Permission to Appeal and now reverse.[4]

## III

The Securities Act does not define "director," so we turn to dictionary definitions from the time Congress enacted the statute. *See New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019). "Director" could mean "[o]ne who . . . directs, rules, or guides; a guide, a conductor; 'one that has authority over

---

[4] The District Court granted Zou and Downs's motions for summary judgment "with respect to their liability pursuant to [§ 77k(a)(2)]," Order at 1, No. 2-14-cv-03620 (D.N.J. May 10, 2017), ECF No. 269, and the parties have litigated this interlocutory appeal solely under § 77k(a)(3). We follow the parties' lead in addressing only § 77k(a)(3), and express no opinion on the correctness of the District Court's summary judgment for Zou and Downs under § 77k(a)(2).

others; a superintendent; [or] one that has the general management of design or work.'" *Director*, Oxford English Dictionary 392 (1st ed. 1933). Or, in a more specialized sense related to business organizations, it could mean "[a] member of a board appointed to direct or manage the affairs of a commercial corporation or company." *Id.*; *see Directors*, Black's Law Dictionary 581 (3d ed. 1933) (defining "director" as a "person[ ] appointed or elected according to law, authorized to manage and direct the affairs of a corporation or company").

Because § 77k(a)(3) also lists "partner[s]" (in context, another business organization title) and because § 77k(a) lists other statutory defendants by technical titles ("underwriters" for example), it seems clear enough Congress meant "director" in the second, specialized sense. *See Yates v. United States*, 135 S. Ct. 1074, 1085 (2015) ("[A] word is known by the company it keeps."); *Bradley v. United States*, 410 U.S. 605, 609 (1973) ("[T]he law uses familiar legal expressions in their familiar legal sense." (quoting *Henry v. United States*, 251 U.S. 393, 395 (1920))).

Beyond the text of the Securities Act, the Exchange Act definition of director—which uses the phrase "director of a corporation"—reinforces our conclusion. *See* 15 U.S.C. § 78c(a)(7) ("The term 'director' means any director of a corporation or any person performing similar functions with respect to any organization, whether incorporated or unincorporated."). So does Securities Act Regulation C, which defines "director" the same way. 17 C.F.R. § 230.405.[5]

---

[5] An amendment to the Securities Act suggests later Congresses agreed. The Private Securities Litigation Reform

10

What functions, then, typify directorship? "The whole of the directors collectively form the board of directors." *Directors*, Black's Law Dictionary 581 (3d ed. 1933). Acting as a board, directors are the corporation's agents. 2 Fletcher Cyc. Corp. § 507 (Sept. 2018 update); 4 Fletcher Cyc. Corp. § 2261 (1918). The board manages the corporation's affairs by: (1) selecting senior officers; (2) controlling executive compensation; (3) delegating administrative authority to officers; (4) making high level corporate policy; (5) deciding financing and capital allocation; and (6) supervising the "welfare of the whole enterprise." 2 Fletcher Cyc. Corp. § 505 (Sept. 2018 update); *see* 4 Fletcher Cyc. Corp. §§ 1729, 1961, 1966 (1918); *Blasband v. Rales*, 971 F.2d 1034, 1044 (3d Cir. 1992). Directors owe duties of reasonable care and loyalty. 3 Fletcher Cyc. Corp. § 990 (Sept. 2018 update); *see* 4 Fletcher Cyc. Corp. § 2261 (1918) ("[W]hether or not directors and other corporate officers are strictly trustees, there can be no doubt that their character is that of a fiduciary so far as the corporation and the stockholders as a body are concerned."). And if shareholders are unhappy with directors, they can vote them out for any reason (or no reason). 3 Fletcher Cyc. Corp. § 357.20 (Sept. 2018 update). At the most basic level, directors are thus defined by their formal power to direct and manage a

---

Act of 1995 amended § 77k(f) to make "outside directors" proportionately (rather than jointly and severally) liable. *See* Pub. L. No. 104-67, § 201(b), 109 Stat. 737, 762 (1995). By specifying "outside directors," a corporate term of art for "nonemployee director[s] with little or no direct interest in the corporation," *Director*, Black's Law Dictionary 473 (7th ed. 1999), the amendment suggests "director" is used in the corporate-law sense rather than the word's broadest sense.

corporation, and the responsibilities and duties that accompany those powers.[6]

<hr>

[6] Plaintiffs point to two Exchange Act SEC interpretive releases they say suggest a broader definition. *See* Obasi Br. 23–25 (discussing Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders, Exchange Act Release No. 17991, 1991 WL 292000 (Feb. 21, 1991) and Interpretive Release on Rules Applicable to Insider Reporting & Trading, Exchange Act Release No. 18114, 1981 WL 31301 (Sept. 24, 1981)). Those releases say a person's title should not determine "whether an advisory, emeritus or honorary director is a director for Section 16 purposes," Release No. 17991, 1991 WL 292000, at *4, and that the focus should instead be on whether the person performs duties likely to make him privy to inside information, *see id.*; Release No. 18114, 1981 WL 31301, at *5 & n.15. But they do not undermine our analysis for two reasons.

First, the releases interpret the meaning of "officers and directors" "for Section 16 purposes." Release No. 17991, 1991 WL 292000, at *4; *see* Release No. 18114, 1981 WL 31301, at *5 & n.15. The releases' purposive interpretations revolve around access to inside information because § 16 is an insider trading provision. *See* Release No. 17991, 1991 WL 292000, at *2; Release No. 18114, 1981 WL 31301, at *5 & n.15; *see also Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 253 (1976) ("Congress thought that all short-swing trading by directors and officers was vulnerable to abuse because of their intimate involvement in corporate affairs."). But § 11 is about ensuring the accuracy of registration statements in securities offerings by issuers, not deterring short-swing profiting by insiders through mandated disclosure

12

of holdings and trades. *Compare Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1323 (2015) ("Section 11 of the Act promotes compliance with these disclosure provisions by giving purchasers a right of action against an issuer or designated individuals . . . .") *with* 1 Louis Loss et al., Securities Regulation 6.E.1 (6th ed. 2018) ("[S]ection 16 remains a useful tool for preventing speculative abuses by insiders and for focusing their attention on their fiduciary duty and on long-term corporate health, rather than on short-term trading profits . . . ." (quoting *Report of the Task Force on Regulation of Insider Trading—Part II: Reform of Section 16*, 42 Bus. Law. 1087, 1092 (1987))).

Section 16's divergent goals manifest in reasoning that would make little sense in the § 11 context. Release No. 17991 explains, for instance, that the terms "[o]fficers, directors, and ten percent holders . . . . also include[ ] an officer or director who has terminated officer or director status but continues to be subject to reporting under Section 16." 1991 WL 292000, at *2 n.14. That expansion of the term's definition may be well-advised in the insider trading context. But it has no connection to the registration statement disclosures § 11 is meant to reach, since former directors have no input into registration statements.

Second, and as we explain *infra* in Part IV, the § 77k(a)(3) inquiry is limited to the face of the registration statement. That limitation is based on language in § 77k(a)(3) ("named in the registration statement as") that does not appear in § 16. *See* § 16(a)(1), 15 U.S.C. § 78p(a)(1) ("Every person *who is* directly or indirectly the beneficial owner of more than 10 percent of any class of any equity security . . . or who is a director or an officer of the issuer of such security, shall file the

"Similar," as the term is used in § 77k(a)(3), is most aptly defined as "[h]aving a marked resemblance or likeness; of a like nature or kind." *Similar*, Oxford English Dictionary 59 (1st ed. 1933). True, there are varying degrees of likeness that might be described as "similar." *See In re Bernard L. Madoff Inv. Sec. LLC*, 773 F.3d 411, 419 (2d Cir. 2014) ("In ordinary usage, the word 'similar' means 'having characteristics in common,' or 'alike in substance or essentials.'" (quoting Webster's New Int'l Dictionary 2120 (3d ed. 1993))); *Ayes v. U.S. Dep't of Veterans Affairs*, 473 F.3d 104, 108 (4th Cir. 2006) ("Although the term 'grant' is not defined in the statute, the use of the word 'similar' limits the universe of 'grants' to . . . only grants bearing a family resemblance . . . ."). But here, the use of "director" in its legal rather than colloquial sense narrows the range of possible meanings and suggests more than slight similarity.

statements required by this subsection with the Commission." (emphasis added)). Section 16, unlike § 77k(a)(3), invites an inquiry into the actual circumstances of a purported director.

Once we accept that distinction, our holding accords with the release provisions Plaintiffs cite. The releases attempt to cover people with policymaking power and access to inside information, while excluding figureheads—without formalistic reliance on titles. Likewise, our interpretation of § 77k(a)(3) includes only persons who, on the face of the registration statement, exercise formal power similar to directors. If the registration statement here described Zou and Downs as having that kind of power, their "observer" title would not absolve them.

14

A commonsense example explains why this is so. We might describe a "sedan" as similar to a "truck"—both are vehicles, after all. But an ordinary English speaker would not say a sedan is similar to a "light-duty pickup truck." The use of a narrowing term of art that distinguishes one class of trucks from others connotes a likeness of specific functions—beyond basics like personal transportation. So too the question here is not whether Zou and Downs are "similar" to "directors" in some abstract sense. The question is rather whether they possess at least some of the core powers and responsibilities that define corporate directorship under the law of corporations.[7]

## IV

Having defined our terms, we turn to consider what sources are relevant to deciding whether a person is a proper § 77k(a)(3) defendant, and who ought to make that decision. As to the first question, the District Court held only the registration statement itself is relevant. We agree. It follows from that holding that whether one is a proper defendant under § 77k(a)(3) is a question of law for the court, not a question of fact for the jury.

## A

What evidence is relevant to our inquiry? Section 77k(a)(3) asks whether a defendant is "with his consent, [ ] *named in the registration statement as* being or about to

---

[7] As we explain *infra* in Part V, Securities Act § 6(a), 15 U.S.C. § 77f(a) (which prescribes who must sign the registration statement) provides additional support for our conclusion that "similar" requires a likeness of formal powers.

become . . . [a] person performing similar functions" to a director. (Emphasis added). The phrase "named in the registration statement as" compels reference to the description provided there. And § 77k(a)(3)'s text, structure, surrounding provisions, and requirement of consent to be named all tell us that the inquiry stops there.

For starters, it would be odd as a matter of logic to consider defendants' real-world actions to determine whether they were "named" in a specified document as "about" to perform certain functions. To "name" a person as "about" to do something is to make a prediction. And § 77k(a)(3) asks only whether the issuer made that prediction in its registration statement. Whether the prediction was well-supported when it was made and whether it came true are irrelevant.

Section 77k(a)(3)'s syntax leads to the same conclusion. To hold extrinsic evidence relevant would substitute an "and" for the "as"—so that once a court finds a person "named" in the registration statement, it then determines whether in fact the person's role is, or will be, director-like. But the statute doesn't say "named in the registration statement *and* . . . about to become . . . [a] person performing similar functions." Read slightly differently, Plaintiffs' preferred interpretation would excise the phrase "named in the registration statement as" altogether and rewrite § 77k(a)(3) to say "every person who, with his consent, is or is about to become a director [or] person performing similar functions." That language too would ask whether Zou and Downs were in fact about to become quasi-directors. And it would make sense then to consider extrinsic evidence. But § 77k(a)(3) doesn't say that either.

Our reading is also supported by § 77k(a)'s provision for expert liability, which uses language much like § 77k(a)(3):

16

> Every accountant, engineer, or appraiser, or any person whose profession gives authority to a statement made by him, *who has with his consent been named as having prepared or certified* any part of the registration statement, or as having prepared or certified any report or valuation which is used in connection with the registration statement, *with respect to the statement in such registration statement, report, or valuation, which purports to have been prepared or certified by him . . . .*

15 U.S.C. § 77k(a)(4) (emphases added). By making the "statement" the subject of the phrase "purports to have been prepared or certified," § 77k(a)(4) limits the inquiry into whether an expert is "named as having prepared or certified" the statement to the face of the document in which it's made. *See Herman & MacLean*, 459 U.S. at 386 n.22 (explaining "accountants with respect to parts of a registration statement which they are not named as having prepared or certified" cannot be held liable under § 77k(a)(4) "even if [they] engaged in fraudulent conduct while participating in the registration statement").

Of course, there was no reason to include the "purports to have been prepared or certified" language in § 77k(a)(3). That's because liability under § 77k(a)(3) is not limited to particular statements within the registration statement. But § 77k(a)(4) confirms the commonsense construction that the phrase "named . . . as" asks only about the words of the document doing the naming. And § 77k(a)'s other subsections likewise suggest the phrase "named . . . as" has this meaning.

17

Furthermore, it's clear Congress knew how to extend liability to a broader class of defendants when it wanted to—because it did. Unlike § 77k(a)(3) and (4), two of § 77k(a)'s enumerated categories are phrased without reference to how a person is named in the registration statement. *See* 15 U.S.C. § 77k(a)(2) (liability for "every person *who was a director* of (or person performing similar functions) or partner in the issuer at the time of the filing of the part of the registration statement with respect to which his liability is asserted" (emphasis added)); *id.* § 77k(a)(5) (liability for "every underwriter with respect to such security"). We "presum[e] that each word Congress uses is there for a reason," *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017), so we will not read the phrase "named in the registration statement as" out of § 77k(a)(3).[8]

Finally, the requirement of consent to be named, *see* § 77k(a)(3), confirms that our inquiry stops at the text of the registration statement. It is hard to see how this consent could be informed if a person's status (and potential liability) were speculative and mutable based on facts and events beyond the text of the registration statement. *See* 5 Arnold S. Jacobs, Disclosure & Remedies Under the Sec. Laws § 3:17 (Dec. 2018 update) ("Questions regarding the interpretation" of the phrase "performing similar functions" "rarely should arise

---

[8] It cannot be that § 77k(a)(3)'s extra language adds merely a requirement that the registration statement disclose the defendant's identity. The Securities Act already requires registration statements to include "the names and addresses of the directors or persons performing similar functions." Securities Act Schedule A, 15 U.S.C. § 77aa(4).

because the person would not give consent unless he thought he was within the ambit of one of the terms").

B

Having decided that the registration statement controls who is subject to § 77k(a)(3) liability, it follows that courts, not juries, must determine the scope of that provision and whether the terms of a registration statement bring a defendant within it. "The construction of written instruments is one of those things that judges often do and are likely to do better than jurors unburdened by training in exegesis." *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 388 (1996); *see also* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (4th ed. Sept. 2018 update) ("[I]f the only issues that are presented involve the legal construction of statutes . . . or the legal sufficiency of certain documents, summary judgment would be proper." (footnotes omitted)). And this inquiry involves "the use of legal skills to determine," *Merck Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679–80 (2019), the significance of statements that are not in dispute.

Even if the inquiry included subsidiary questions of fact, "[u]niformity would . . . be ill served," *Markman*, 517 U.S. at 391, by submitting to juries the threshold question whether the face of a registration statement brings a defendant within § 77k(a)(3). Registration statements in public securities offerings are addressed to the whole investing public and are likely to describe putative defendants' functions in familiar but technical terms of art. It is important for issuers, investors, and putative defendants to know the scope of quasi-director liability. We hold that whether a defendant is "named in the registration statement as being or about to become a director[ ]

19

[or] person performing similar functions," § 77k(a)(3), is a question of law for the court.[9]

V

As we have explained, the function of a board of directors is to direct and manage the company's affairs. Individual directors do this by formal voting. And because each director bears part of the ultimate responsibility for the company's fate, each owes duties of care and loyalty and may be voted out for mismanagement (or for no reason at all). Zou and Downs's roles, as described in the registration statement, are not "of a like nature or kind," *Similar*, Oxford English Dictionary 59 (1st ed. 1933).

Three features differentiate Zou and Downs from directors. First, and most fundamentally, Zou and Downs cannot vote for board action. Second, they are aligned with the

---

[9] It's conceivable that a registration statement's description of a defendant might include ambiguous terms. A judge might then look to evidence of technical meaning (or to other extrinsic sources). While this would be factfinding reviewable only for clear error, *see Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 840 (2015), we think this is the sort of subsidiary factfinding that is "subsumed within an already tightly circumscribed legal analysis." *Merck Sharp & Dohme*, 139 S. Ct. at 1680. So we decline to extend our Circuit's rule in contract interpretation—that juries interpret ambiguous terms, *see Wayne Land & Mineral Grp. LLC v. Delaware River Basin Comm'n*, 894 F.3d 509, 528 (3d Cir. 2018)—to this context.

placement agent, A&S, not Tibet. And third, their tenures are set to end automatically, with no opportunity to vote them out. Without the ability to manage the company's affairs, Zou and Downs lack directors' most basic power. As agents of Tibet's placement agent, their loyalties aren't with Tibet's shareholders—and loyalty to shareholders is as vital to directorship as the power to manage. And unlike Tibet's directors, their tenure is not subject to shareholder vote. Add to that the registration statement's express provision for directors' fiduciary duties, with no similar provision for Zou and Downs.

Consider a hypothetical investment analyst for a research firm. Like Zou and Downs, he owes no duties to the issuer and is affiliated with a different entity. He might also enjoy special access to the issuer's board and management. *Cf. Regulation FD*, 17 C.F.R. § 243.100 (seeking to curtail special access to non-public information). Or he might not. But either way, access to managers and directors alone does not make a person a quasi-director. Consider the analyst's power to influence the issuer's board. It might be substantial, depending on the analyst's reputation and influence in the industry. Or it might not. In either case, he has the same "power" Zou and Downs do—the "possibility" of "significantly influenc[ing] the outcome of matters submitted to the Board of Directors for approval." App. 178. The analyst's influence—his power to persuade—might even "impact [the issuer's] shareholders' ability to impact decisions related to [its] operations." *Id.* Or it might not. But no one would argue that our hypothetical analyst is in any meaningful way "similar" to a board member.

Our conclusion is also supported by Securities Act § 6(a) and the consent requirement of § 77k(a)(3). And it fits both the scant caselaw interpreting § 77k(a)(3) and the only case in which our Court has interpreted parallel language.

21

First, Securities Act § 6(a), 15 U.S.C. § 77f(a), which lists who must sign[10] the registration statement, suggests "similarity" requires a close identity with the core functions we've described. The registration statement must be signed by "the majority of [the] board of directors or persons performing similar functions (or, if there is no board of directors or persons performing similar functions, by the majority of the persons or board *having the power of management of the issuer*) . . . ." 15 U.S.C. § 77f(a) (emphasis added). This suggests that having "the power of management of the issuer" (a power the board delegates to management) is not even enough to qualify as "similar." But management has far more formal power than Zou and Downs.

Second, § 77k(a)(3) imposes liability only on a person named in the registration statement as a director or similar "with his consent." Consent can't be inferred merely by the appearance of one's name in the registration statement. By regulation, the registration statement must include express, written consent, filed as an exhibit. *See* 17 C.F.R. § 230.438. Exceptions are permitted only where there is affidavit-supported impracticability or undue hardship for the registrant. *Id.* This consent requirement suggests a level of formality consistent with our interpretation of "performing similar functions." It would be odd for observers like Zou and Downs, who have no formal powers, to execute a formal consent that envisioned § 11 liability.

And third, our conclusion tracks the only cases to interpret the phrase "performing similar functions" in

_____

[10] And thus become liable for misstatements under § 77k(a)(1).

22

§ 77k(a)(3), as well as our Court's lone interpretation of the same phrase in a different context. The two district courts to consider the phrase suggested it requires something like formal powers. *See Mersay v. First Republic Corp. of Am.*, 43 F.R.D. 465, 469 (S.D.N.Y. 1968) (member of "executive advisory board" didn't qualify, because "[m]ost probably, this phrase is concerned with imposing liability upon the person who is actually directing the affairs of the corporation, but who, for the purpose of avoiding liability, shuns the formal title 'director'"); *Lockheed Aircraft Corp. v. Rathman*, 106 F. Supp. 810, 812 (S.D. Cal. 1952) ("It is quite apparent that Congress added the 'or any person' provision to apply to organizations which did not have directors in name but did have persons who performed functions similar to those ordinarily performed by the directors of a corporation.").

And the only case in which our Court interpreted the phrase (in a different context) is likewise consistent with the conclusion that "performing similar functions" entails a similarity of formal powers and duties. In *First Liberty Investment Group v. Nicholsberg*, 145 F.3d 647 (3d Cir. 1998), we applied the phrase in a National Association of Securities Dealers arbitration provision that borrowed its language from the Exchange Act. We held a purportedly independent contractor "perform[ed] similar functions" to those of a "branch manager" of a broker-dealer. *Id.* at 651–52. Among the reasons why were that the broker-dealer: provided the contractor "facilities . . . for execution of transactions"; designated the contractor's office "an entity allowed . . . to offer and solicit the sales of securities"; "gave [the contractor] geographic exclusivity . . . and agreed not to open competing offices without [his] prior written consent"; required the contractor to comply with its policies and seek prior approval

for securities solicitation; and forbade the contractor to transact with other broker-dealers. *Id.* at 652.

The contractor was thus closely affiliated with the broker-dealer, and operated very much like a branch manager would—with formal powers, rights, and duties to match. *See id.* ("[T]he parties' total relationship, including the limitations placed by [the broker-dealer] both on [the contractor's] conduct of his business and on its own conduct of business, amount to . . . placing [the contractor] in much the same practical position that would be occupied by a branch manager in charge of [the broker-dealer's] only New York metropolitan area office."). Unlike that close fit, Zou and Downs's role as nonvoting board observers does not put them "in much the same practical position," *id.*, as Tibet's directors.

Plaintiffs' two main arguments to the contrary are unpersuasive. First, they contend the registration statement contains a "clear grant of limitless power to Appellants to 'significantly' influence the 'outcomes' of the highest-level corporate decision-making . . . ." Obasi Br. 12. Far from it. That Zou and Downs, as nonvoting observers, "may" influence board decisions is not a grant of power at all. That's so even if their influence turns out to be "significant." And it's so notwithstanding the observations of "an experienced investor" about the real-world social dynamics of boardrooms. Obasi Br. 25–28. Simply put, the face of the registration statement confers no actual power upon Zou or Downs.

The Sixth Circuit made a similar point in *Bennett v. Durham*, 683 F.3d 734 (6th Cir. 2012), a case interpreting "performing similar functions" language in a state blue sky statute. *Id.* at 736 (quoting Ky. Rev. Stat. § 292.480). The plaintiffs there argued the company's "officers and directors

24

'relied completely' on [the defendant's] work and would have 'structured their sales operation in any way [the defendant] advised.'" *Id.* at 738 (quoting appellate brief). The court rejected that argument as "suggest[ing] only that [the company's] *actual* partners, officers and directors relied heavily on [the defendant], not that [he] was the one calling the shots." *Id.*

Finally, Plaintiffs insist the Securities Act is a remedial statute that we should construe broadly. That may be so, *see Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 151 (1972), but the argument misses the mark here. *Cf. SEC v. Zandford*, 535 U.S. 813, 820 (2002) ("[T]he statute must not be construed so broadly as to convert every common-law fraud that happens to involve securities into a violation of § 10(b) . . . ."). Congress expressly circumscribed the class of defendants subject to § 11 liability—and it did so for good reason. Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 381–82 (footnote omitted); *cf. Lehman Bros.*, 650 F.3d at 181 (discussing limited scope of § 11 underwriter status). Plaintiffs' broad construction argument relies "on the flawed premise" that the statute "'pursues' its remedial purpose 'at all costs.'" *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018) (quoting *Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 234 (2013)). Such an approach "frustrates rather than effectuates legislative intent" because it "simplistically . . . assume[s] that *whatever* furthers the statute's primary objective must be the law." *Rodriguez v. United States*, 480 U.S. 522, 526 (1987) (per curiam).

25

Plaintiffs also overstate the concern that a broad construction is necessary to hold wrongdoers accountable. Section 11 is but one part of an overlapping web of civil liability provisions. Recall that Plaintiffs allege "Zou and Downs orchestrated the fraudulent sale of $16.5 million of worthless Tibet stock." Obasi Br. 10. Exchange Act § 10(b), 15 U.S.C. § 78j, and Rule 10b-5, 17 C.F.R. § 240.10b-5, have been interpreted to grant a broad private right of action for fraud in the purchase or sale of securities. *See Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 141–42 (2011). Or take Securities Act § 12(a)(2), 15 U.S.C. § 77*l*(a)(2), which provides a right of rescission for private plaintiffs where a seller makes misleading statements or omissions in a prospectus. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 564, 567 (1995). Securities Act § 15, 15 U.S.C. § 77o, provides yet another remedy—one that Plaintiffs sought and then abandoned. Then there's Exchange Act § 18, 15 U.S.C. § 78r, which provides a right of action for damages against "any person" who makes a false or misleading statement in Exchange Act filings. And Exchange Act § 9, 15 U.S.C. § 78i, gives plaintiffs a private right of action for manipulation of security prices in national exchanges. *See Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1104 (1991). Add to all these provisions additional remedies under state blue sky laws and common law. Apart from these private remedies, the SEC also holds wrongdoers accountable through the many enforcement mechanisms available only to it.

For these reasons, "we will not presume with [Plaintiffs] that any result consistent with their account of the statute's overarching goal must be the law but will presume more modestly instead 'that the legislature says what it means and means what it says.'" *Henson v. Santander Consumer USA*

26

*Inc.*, 137 S. Ct. 1718, 1725 (2017) (quoting *Dodd v. United States*, 545 U.S. 353, 357 (2005)).

\*     \*     \*

Because Zou and Downs were not "named in the registration statement as being or about to become [ ] director[s] [or] person[s] performing similar functions," we will reverse the District Court's denial of summary judgment and direct the entry of judgment for Zou and Downs.

*COWEN,* dissenting

The District Court certified the following question for interlocutory appeal:

> Can Defendants be potentially liable under Section 11 of the Securities Act of 1933, each as a "person performing similar functions" to a director, in light of Defendants' role as board observers who could (but did not necessarily have to) significantly influence the outcome of matters submitted to the board of directors for approval?

(2/21/18 Order at 2.) Because I agree with the District Court that this question must be answered in the affirmative, I respectfully dissent.

I do not really take issue with the basic definitions of "director" and "similar" offered by the majority, although I do reject its application of these concepts. "[I]n a more specialized sense related to business organizations, ['director'] could mean '[a] member of a board appointed to direct or manage the affairs of a commercial corporation or company.' [Director, Oxford English Dictionary 392 (1st ed. 1933)]; see Directors, Black's Law Dictionary 581 (3d ed. 1933) (defining 'director' as a 'person[ ] appointed or elected according to law, authorized to manage and direct the affairs of a corporation or company')." (Majority Opinion at 10.) The District Court likewise "defines 'director' as [inter alia] '[a] person appointed or elected to sit on a board that manages the affairs of a corporation or other organization by electing and exercising control over its officers.'" Dartell v. Tibet Pharms., Inc., Civil Action No. 14-3620, 2017 WL 1944106,

1

at *9 (D.N.J. May 10, 2017) (footnote omitted) (quoting Director, Black's Law Dictionary (10th ed. 2014)). In general, the term "similar" is "most aptly defined as '[h]aving a marked resemblance or likeness; of a like nature or kind'" (id. at 14 (quoting Similar, Oxford English Dictionary 59 (1st ed. 1933))). See, e.g., id. ("The Court will also apply the ordinary meaning of 'similar,' which is defined as 'having characteristics in common.' See Similar, [Merriam-Webster Dictionary] (2016).").

Even if Section 11(a)(3) of the Securities Act thereby requires more than some slight similarity, the majority fails to recognize the expansive scope of this "similar" language. Congress chose to use this word instead of the terms "identical" or the "same"—or even "essentially identical" or "essentially the same." We should honor Congress's choice of such language, which the majority acknowledges could encompass varying degrees of likeness. According to the majority, "[t]he question is rather whether they possess at least some of the core powers and responsibilities that define corporate directorship under the law of corporations." (Id. at 15 (footnote omitted).) However, the statutory language plainly requires that the individual merely perform functions "similar" to, i.e., "'of a like nature or kind'" as (id. at 20 (quoting Similar, Oxford English Dictionary 59 (1st ed. 1933)), the functions of a director. The majority's approach actually resembles the formulation set forth by the British Companies Act of 1929, which defines "director" as including "any person occupying the position of director by whatever name called." (JA818 (comparing statutory language).) Although the Securities Act was modeled on the British Companies Act, see, e.g., Gustafson v. Alloyd Co., 513 U.S. 561, 599 (1995) (Ginsburg, J., dissenting), Congress

2

did not follow Parliament's "director by whatever name called" approach. It instead adopted what could only be considered a more sweeping "similar" formulation.

More broadly, the Court should not overlook the purposes of the 1933 Securities Act as well as Section 11 in particular. The "basic purpose" of this legislation was "to provide greater protection to purchasers of registered securities." Herman & MacLean v. Huddleston, 459 U.S. 375, 383 (1983). Section 11 was then "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." Id. at 381-82 (footnotes omitted). Admittedly, Section 11 actions (which, as the District Court acknowledged, implicate virtually absolute liability) can only be brought against certain defendants (which do not include, for example, corporate officers other than as specified). See, e.g., id. at 382 & n.13, 386 n.22. Nevertheless, Section 11 still encompasses a wide range of defendants, including every person who signed the registration statement; every person who was a director of (or person performing similar functions) or partner in the issuer at the time of filing; every accountant, engineer, appraiser, or any person whose profession gives authority to a statement made by him, who has with his consent been named as having prepared or certified any part of the registration statement, or as having prepared or certified any report or valuation used in connection with the registration statement, with respect to the statement in such document, which purports to have been prepared or certified by him; and every underwriter with respect to such security. The Supreme Court has "repeatedly recognized that securities laws combating fraud should be construed 'not technically and restrictively, but flexibly to

3

effectuate [their] remedial purposes.'" Id. at 386-87 (quoting SEC v. Capital Gains Research Bureau, 375 U.S. 180, 195 (1963)).  We should thereby specifically consider whether the defendant is named in the registration statement as being or about to become a person performing similar functions to a director with respect to the drafting, publication, or accuracy of the registration statement itself.  Furthermore, "Plaintiffs point to two Exchange Act SEC interpretive releases they say suggest a broader definition."  (Majority Opinion at 12 n.6 (citing Ownership Reports & Trading by Officers, Directors & Principal Sec. Holders, Exchange Act Release No. 17991, 1991 WL 292000 (Feb. 21, 1991); Interpretive Release on Rules Applicable to Insider Reporting & Trading, Exchange Act Release No. 18114, 1981 WL 31301 (Sept. 24, 1981)).  "Those releases say a person's title should not determine 'whether an advisory, emeritus or honorary director is a director for Section 16 purposes,' Release No. 17991, 1991 WL 292000, at *4, and that the focus should instead be on whether the person performs duties likely to make him privy to inside information, see id.; Release No. 18114, 1981 WL 31301, at *5 & n.15."  (Id.)  While these releases implicate the Exchange Act and access to inside information, they certainly are consistent with the expansive statutory language and legislative purposes at issue in this appeal.  In fact, the majority looks elsewhere in its opinion to "the Exchange Act definition of director" (id. at 10 (quoting 15 U.S.C. § 78c(a)(7)), and Defendants likewise rely on the SEC's interpretation.

Accordingly, a person may be named as performing similar functions to a director even if he or she does not possess the directors' "formal power to direct and manage a corporation, and the responsibilities and duties that

4

accompany those powers" (<u>id.</u> at 11-12 (footnote omitted)). On the contrary, he or she is a person named in the registration statement as being or about to become a person performing similar functions if, pursuant to this statement, he or she possesses powers or abilities that are of a like nature or kind as the power to direct or manage the affairs of the corporation. As the District Court aptly explained, "a defendant may be held liable if he had the ability to exercise similar control and management as a director when the registration statement at issue was filed or was named as about to assume such a role in the registration statement, even if the corporation at issue also had a board of directors or persons about to be named directors." <u>Dartell</u>, 2017 WL 1944106, at *9. Applying this approach to the Tibet registration statement, I have no difficulty concluding that Zou and Downs are proper Section 11(a)(3) defendants.[1]

---

[1] I agree with the majority that, in considering a claim under Section 11(a)(3), we must look to what is actually stated in the registration statement (as opposed to the defendant's real-world actions). I, however, do not agree that "whether one is a proper defendant under § 77k(a)(3) is a question of law for the court, not a question of fact for the jury." (Majority Opinion at 15.) While judges often do construe written instruments, there are some clear exceptions. For example, if a contract is susceptible to multiple reasonable interpretations, the contract is ambiguous, and the jury is tasked with resolving that ambiguity. <u>See, e.g.</u>, <u>Baldwin v. Univ. of Pittsburgh Med. Ctr.</u>, 636 F.3d 69, 76 (3d Cir. 2011); <u>Ram Const. Co. v. Am. States Ins. Co.</u>, 749 F.2d 1049, 1052 (3d Cir. 1984). The whole concept of similarity also appears to trigger the sort of open-ended factual

5

"[T]he registration statement explained 'they [Zou and Downs] may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval." (Id. at 4 (quoting JA178).) Specifically, the "**Management**" section of the statement (JA226) included a subsection addressing the "**Relationship with our Placement Agent**":

---

assessment that a jury would usually be expected to undertake, i.e., deciding whether something is more or less "similar' to something else and whether this similarity is enough to satisfy the statutory scheme. In this case, Zou "was an early investor in Tibet and the sole director of [China Tibetan], a wholly owned subsidiary of Tibet." (Id. at 4.) "Tibet's ability to control Yunnan flowed through China Tibetan." (Id.) It was Zou who told the placement agent and Downs about Tibet, and the two Defendants "then worked together to bring Tibet public." (Id.) Zou opened China Tibetan's HSBC Hong Kong bank account, and his name remained on the account. Defendants insist that Zou's name was supposed to be removed, he did not make any withdrawals or transfers into or out of the China Tibetan account, Tibet's CEO and its cashier had complete control over the account, and Tibet had full control over the IPO proceeds, which were deposited into another account held by Tibet. However, more than $4 million was deposited into China Tibetan's account just two days after the proceeds were transferred to Tibet's HSBC Hong Kong account, and approximately $3.5 million in cash was then withdrawn from the China Tibetan account less than a month later. In any event, I believe that Plaintiffs prevail even if the present inquiry is characterized as a question of law for the courts to decide.

In connection with this offering, we have agreed to allow our Placement Agent to designate two non-voting observers to our Board of Directors until the earlier of the date that:

- The investors that purchase shares in this offering beneficially own less than 5% of our outstanding shares; or

- The trading price per share is at least $24 per share for any consecutive 15 trading day period.

It is anticipated that Mr. Downs, our Placement Agent's Senior Vice President, and Mr. Hayden Zou will serve as the Placement Agent's observers to our Board of Directors.

Although our placement agent's observers will not be able to vote, they may nevertheless influence the outcome of matters submitted to the Board of Directors for approval. We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $6,000 per meeting and $12,000 annually, which amount is not more than the reimbursement payable to our directors. The observer will be required to certify that such travel expenses are not reimbursed by any other party. We will also pay observers the same amount as our independent directors receive.

7

(JA230.)  A similar subsection was included as part of the **"RISK FACTORS**" discussion (JA152):

> **We will have an ongoing relationship with our Placement Agent that may impact our shareholders' ability to impact decisions related to our operations.**
>
> In connection with this offering, we have agreed to allow our Placement Agent to designate two non-voting observers to our Board of Directors until the earlier of the date that:
>
> > (i) the investors that purchase shares in this offering beneficially own less than five percent (5%) of our outstanding shares; or
> >
> > (ii) the trading price per share is at least four (4) times the offering price for any consecutive 15 trading day period.
>
> Although our Placement Agent's observers will not be able to vote, they may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval.  We have agreed to reimburse the observers for their expenses for attending our Board meetings, subject to a maximum reimbursement of $6,000 per meeting and

8

$12,000 annually, which amount is not more than the reimbursement payable to our directors. The observer will be required to certify that such travel expenses are not reimbursed by any other party. We will also pay observers the same amount as our independent directors receive. As of the date of this prospectus, Mr. L. McCarthy Downs III and Mr. Hayden Zou are serving as our Placement Agent's observers to our Board of Directors. See "Management – Board of Directors Observer."

(JA178.)

According to the majority, there are three features differentiating Defendants from directors: (1) "First, and most fundamentally, Zou and Downs cannot vote for board action" while individual directors direct and manage company affairs by means of formal voting (Majority Opinion at 20); (2) they are aligned with the placement agent as opposed to Tibet and its shareholders; and (3) their tenures are set to end automatically without any opportunity for the shareholders to vote them out. There are some obvious differences between observers as described by the registration statement and directors (after all, even the registration statement acknowledged Defendants' inability to vote), and I agree with the District Court that "simply being named a board observer did not open Downs or Zou up to Section 11 liability because the title does not indicate that such a position necessarily performs similar functions to a director," Dartell, 2017 WL 1944106, at *10. However, the registration statement went beyond merely identifying two non-voting board observers.

9

It also indicated that: (1) most importantly, Defendants may nevertheless significantly influence the outcome of matters submitted to the Board of Directors for approval; (2) Defendants are aligned with the placement agent in exercising this significant influence over Board action—serving as the placement agent's own "eyes and ears at Board meetings" as Defendants put it (Appellants' Reply Brief at 12 (footnote omitted))—and could not be voted out by the shareholders; (3) in order to observe and exercise their significant influence, Defendants implicitly have the right to inside information, to attend meetings of the Board of Directors, and to speak or otherwise share their opinions; and (4) Defendants are entitled to the same pay as "our independent directors receive" (JA178, JA230) and (like the members of the Board of Directors) are also eligible for reimbursement for attending Board meetings (although their reimbursement is capped).

Given the plain language of the registration statement, Defendants are clearly named as possessing powers or abilities that are of a like nature or kind as the directors' power to direct or manage the affairs of the corporation:

> The prospectus does not define any of the words used to describe the Board Observers' role. As a result, the Court turns to dictionary definitions. First, the statement indicates that Board Observers would have the ability to influence the Tibet Board. "Influence" is defined as "the power or capacity of causing an effect in indirect or intangible ways." Influence, [Merriam-Webster Dictionary] (2016). Next, the description provides that this influence would be

10

significant. "Significant" means "of a noticeably or measurably large amount." Significant, [Merriam-Webster Dictionary] (2016). Thus, the language "significantly influence" indicates that the two Board Observers could play a critical role in board decisions.

Id. at *10. In fact, the registration statement "does not place a limit on whom or what they may influence," id., and Defendants' thereby may "significantly" influence the outcome of all matters submitted to the Board—which, according to the statement, "makes all relevant [Tibet] decisions" (JA229). In turn, "our Placement Agent's observers" were appointed "[i]n connection with this offering" (JA178, JA230), indicating that Defendants' capacity for significant influence is linked to the public offering itself. See, e.g., Herman & MacLean, 459 U.S. at 381-82 (observing that Section 11 was "designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering" (footnotes omitted)). Furthermore, similar compensation points to similarity in functions. After all, compensation (at least theoretically) reflects the sort of work the individual has performed.

According to the majority, "[t]hat Zou and Downs, as nonvoting observers, 'may' influence board decisions is not a grant of power at all." (Majority Opinion at 24.) It compares Defendants to a hypothetical investment analyst for a research firm, who might (or might not) have special access to the issuer's board of directors and management, power to

11

influence the board based on the analyst's reputation and influence in the industry, and whose "influence—his power to persuade—might even 'impact [the issuer's] shareholders' ability to impact decisions related to [its] operations'" (id. at 21 (quoting JA178)). However, we do not—and should not—decide whether this imaginary analyst is named as being or about to become a director or a person performing similar functions. In any event, there is no indication that the analyst resembles "our Placement Agent observers" (JA230) and is entitled to similar compensation as the directors. The majority continues to insist that Section 11(a)(3) "includes only persons who, on the face of the registration statement, exercise formal power similar to directors" (Majority Opinion at 14 n.6)—even though someone need not have any "formal powers" to perform similar functions under Section 11(a)(3). In fact, influence is itself a form of power, defined as "*the power or capacity* of causing an effect in indirect or intangible ways." Influence, Merriam-Webster Dictionary (2016) (emphasis added). Under the plain language of the registration statement, such "significant" power over the outcome of matters submitted to the Board of Directors for approval is of a like nature or kind to the formal powers that directors possess to direct and manage the company's affairs. In fact, Defendants may have more real power than the nominal members of the Board of Directors. The majority recognizes that directors act as a board and that it is the board of directors that manages the corporation's affairs. In short, an individual director or group of directors may vote and lose on matters submitted to the Board for approval and thereby fail to influence the outcome of such matters while Defendants "may nevertheless significantly influence the outcome of [the] matter[ ]" (JA178). In such circumstances,

12

the statutory language and purpose plainly mandate holding such individuals liable under Section 11(a)(3).[2]

For the foregoing reasons, I would affirm the District Court's denial of summary judgment.[3]

---

[2] I also am not persuaded by the other arguments raised by the majority opinion, including the case law it cites. In First Liberty Investment Group v. Nicholsberg, 145 F.3d 647 (3d Cir. 1998), this Court did not consider whether a defendant was named as being or about to become a person performing similar functions as a director. Instead, it "applied a phrase in a National Association of Securities Dealers arbitration provision" (Majority Opinion at 23) and, in any event, "held a purportedly independent contractor 'perform[ed] similar functions' to those of a 'branch manager' of a broker-dealer" (id. (quoting First Liberty, 145 F.3d at 651-52)). Applying a state blue sky statute, the Sixth Circuit explained that "Clayton offered no facts on summary judgment from which we could infer that Durham did anything beyond what would be expected of a securities attorney providing run-of-the-mine legal services." Bennett v. Durham, 683 F.3d 734, 738 (6th Cir. 2012) ("Clayton's brief on appeal seeks to add more, but the effort is too little and too late."). The district court decisions, in turn, read the statutory language too narrowly, taking it to mean persons performing the same functions as directors while shunning the directorial title. See, e.g., Mersay v. First Republic Corp. of Am., 43 F.R.D. 465, 469 (S.D.N.Y. 1968); Lockheed Aircraft Corp. v. Rathman, 106 F. Supp. 810, 812 (S.D. Cal. 1952). Finally, I note that Defendants have failed to argue that they never consented to be named in the registration statement.

---

<sup>3</sup> Defendants also assert that Section 11(a)(3), at least as interpreted by the District Court and Plaintiffs, would be unconstitutionally vague as applied to them.  Given my analysis of this statutory provision, I do not agree that it "'fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute.'" Papachristous v. City of Jacksonville, 405 U.S. 156, 162 (1972) (quoting United States v. Hariss, 347 U.S. 612, 617 (1954)).